MINNESOTA MINING AND MANUFAC-
TURING COMPANY, a Corporation
of Delaware, Plaintiff,

v.

BERWICK INDUSTRIES, INC., a Corpo-
ration of Pennsylvania,
Defendant.

Civ. No. 73–120.

United States District Court,
M. D. Pennsylvania.

March 18, 1975.

See also, D.C., 373 F.Supp. 851.

Edward A. Haight, Britton A. Davis, Chicago, Ill., Edward T. Okubo, Terryl K. Qualey, St. Paul, Minn., for plaintiff.

Samuel Gottlieb, Bernard Beitel, New York City, for defendant.

## OPINION

MUIR, District Judge.

### TABLE OF CONTENTS

1. Background — p. 1231
2. Validity of the '223 Patent — p. 1232
3. Infringement of the '223 Patent — p. 1236
   3.1 The '223 Apparatus Claims with Respect to the Wanchek, Tye-Sil and Camberloc Machines — p. 1236
   3.2 The '223 Apparatus Claims with Respect to the Bowmatic Machine — p. 1237
   3.3 Possible Restriction of the Broad Claims of the '223 Patent to the Machine Illustrated in the Patent — p. 1238
   3.4 The '223 Method Claims with Respect to Camberloc, Wanchek and Tye-Sil Machines — p. 1239
   3.5 The '223 Method Claims with Respect to the Bowmatic Machine — p. 1239
4. Validity of the '240 Patent — p. 1239
   4.1 The File Wrapper Limitation on the '240 Patent — p. 1240
   4.2 Obviousness of the Invention Claimed in the '240 Patent — p. 1242
5. Further Support for the Court's Previous Finding of Laches Against 3M — p. 1243
6. Berwick's Antitrust Counterclaim and Its Assertions of Equitable Estoppel Against 3M — p. 1243
7. Damages — p. 1244

### 1. *Background.*

Minnesota Mining and Manufacturing Company (3M) has sued Berwick Industries, Inc. (Berwick) for infringement of United States patents numbered 2,933,223 and 3,112,240 ('223 and '240) relating to decorative bows and apparatus and a method for making such bows. 3M seeks damages and originally sought an injunction against further infringement. The claim for an injunction has been dropped. Berwick denies infringement and challenges the validity and enforceability of the patents. Berwick counterclaimed charging 3M with restraint of trade and unfairness in asserting the patents.

By an amended answer, Berwick pleaded the defense of laches and estoppel. At the trial on the issues of laches and estoppel in January, 1974, Berwick prevailed on the issue of laches but failed on the defense of estoppel. Minnesota Mining and Manufacturing Co. v. Berwick Industries, Inc., 373 F.Supp. 851 (Pa.1974). The trial was thereafter resumed on the merits for 13 additional trial days.

Detailed findings of fact and conclusions of law are filed contemporaneously with this Opinion and are incorporated herein by reference.

### 2. Validity of the '223 Patent.

The '223 patent was issued April 19, 1960 and relates to a machine for making decorative ribbon bows and also relates to a method for making the bows. These bows are of the pom-pon and star types used in great numbers in this country for affixture to gifts. The pom-pon bow is hemispherically shaped. The star bow is of five or more points.

The machines covered by the apparatus claims patent have three *essential* elements: a shaft for supporting a supply roll of ribbon, a so-called rotatable loop retaining means and a ribbon feed means. The feed means withdraws from the supply roll and applies a portion of the ribbon to the retaining means. The retaining means firmly holds ribbon which had been fed to it, rotates between each application of ribbon, and forms a loop by each rotation. The loops are disposed on different radii, thus forming the star or pom-pon bow. The ribbon is twisted in the manufacture of the star bow, but not in the creation of the pom-pon bow.

Method claims numbered 14 and 15 and apparatus claims numbered 1, 2, 5 and 17 are said by 3M to have been infringed by Berwick. The claims are set out in the margin.[1]

1. We claim:

1. In a machine for making decorative bows from a continous length of ribbon or strip material, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto and rotatively therewith ribbon applied thereagainst, said feed means operating successively to apply portions of ribbon spaced along the continuous length thereof against said retaining means successively to form radiating loops of ribbon.

2. In a machine for making decorative bows from a continuous length of ribbon, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto ribbon applied thereagainst, said feed means operating successively to apply portions of ribbon spaced along the continuous length thereof against said retaining means successively to form radiating loops of ribbon, said retaining means being caused to rotate between applications thereto of said ribbon portions.

5. A machine for making decorative bows from a continuous length of ribbon comprising a shaft for receiving and rotatably supporting a supply roll of ribbon, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto ribbon applied thereagainst; said feed means operating to withdraw a continuous length of ribbon from a supply roll mounted on said shaft and successively to apply portions of ribbon spaced along said continuous length against said retaining means successively to form radiating loops of ribbon, said retaining means being caused to rotate between each application of a ribbon portion thereto, said loops thereby being twisted as they are formed and being disposed on different radii.

14. In fashioning a decorative bow from a continuous length of strip material, the steps comprising: grasping a length of strip materal adjacent its free end and at a point spaced therefrom, unidirectionally twisting the portion of ribbon between the points where grasped and bringing the strip material at said free end and at said spaced point together in uncreased intersecting face-to-back relation to form a first loop having a first leg adjacent said free end, a second leg adjacent said space point and a smoothly arcuate bight; fastening the legs of said loop together at their point of intersection; grasping said strip material at said point of intersection and at a third point along said length spaced from said point of intersection, twisting the strip material between said point of intersection

The method claimed in the '223 patent includes the steps of

1. Grasping a length of ribbon at one end and at another point,

2. Twisting the ribbon between the two points where it is grasped,

3. Bringing the points together in a face to back relationship to form a loop,

4. Fastening the points together,

5. Forming the next loop by grasping the ribbon at a third point,

6. Twisting the ribbon and bringing the third point into face to back relationship with itself at the prior point of fastening,

7. Fastening it again and

8. Continuing the process until the desired number of loops or points are formed.

■ 35 U.S.C. § 282 declares that claims of granted patents are presumed to be valid. Consequently, Berwick has the burden of proof as to invalidity of the '223 patent and must do so by clear and convincing evidence. Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F. 2d 66 (3d Cir. 1972), cert. denied 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972).

To invalidate the claims of the patent, Berwick must prove that the invention lacked utility (35 U.S.C. § 101), that it was not novel when invented by the patentee (35 U.S.C. § 102), or that at the time the invention was made, the subject matter thereof would have been obvious to one having ordinary skill in the art to which the invention pertains (35 U.S.C. § 103). Berwick claims that the patent is invalid because what is claimed would have been obvious to anybody of ordinary skill in the art.

■ Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) sets forth the primary inquiries we must make and resolve to determine obviousness. They relate to

1. The scope and content of the prior art,

2. Differences between the prior art and the claims at issue, and

and said third point unidirectionally in the same relative direction as before and bringing the strip material together at said point of intersection and said third point together at said point of intersection in intersecting face-to-back relation to form a second loop having a first leg which is common with and a continuation of the second leg of said first loop, a second leg adjacent said third point and a smoothly arcuate bight; and fastening said loops together at said points of intersection.

15. In fashioning a decorative bow from a continuous length of strip material, the steps comprising: grasping a length of strip material adjacent its free end and at a point spaced therefrom, unidirectionally twisting the portion of ribbon between the points where grasped and bringing the strip material at said free end and at said spaced point together in uncreased intersecting face-to-back relation to form a first loop of generally conoidal shape having a first leg adjacent said free end, a second leg adjacent said space point and a smoothly arcuate bight; impaling said legs on a central holding pin at the point of intersection of said legs; grasping said strip material at said point of intersection and at a third point along said length spaced from said point of intersection, twisting the strip material between said point of intersection and said third point unidirectionally in the same relative direction as before and bringing the strip material together at said point of intersection and said third point together at said point of intersection in intersecting face-to-back relation to form a second loop of generally conoidal shape having a first leg which is common with and a continuation of the second leg of said first loop, a second leg adjacent said third point and a smoothly arcuate bight; and impaling the second leg of said second loop on said pin at said third point.

17. A machine for making decorative bows from a continuous length of ribbon comprising a shaft for receiving and rotatably supporting a supply roll of ribbon, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto and rotatively therewith ribbon applied thereagainst; said feed means operating to withdraw a continuous length of ribbon from a supply roll mounted on said shaft and successively to apply portions of ribbon spaced along said continuous length against said retaining means successively to form radiating loops of ribbon.

3. The level of ordinary skill in the pertinent art.

■ Thereafter, secondary factors such as commercial success, long-felt but unsolved needs, and failure of others may be considered by the Court under Graham v. John Deere Co., *supra*, as some indicia of obviousness or nonobviousness.

■ Berwick relies in large measure on three prior patents, Webb No. 1,209,-525, Cotton No. 1,728,724 and Cook No. 2,775,377.

The Webb patent granted December 19, 1916 relates to a machine for forming small bows from a continuous length of material for ornamenting or finishing the joints of sweatbands in men's hats. The machine simulates the use of human hands in tying a bow knot. The ribbon is grasped, a loop is formed, and then the ribbon is rotated 360 degrees around the loop to form the initial portion of the knot; the second loop is formed by a similar process and the machine pulls it through the knot.

The Cotton patent granted September 17, 1929 relates to a machine for making rosette blanks of fabric such as silk, ribbon or yarns for ornaments for ladies' wear. The rosette blanks are made through the automatic looping of ribbon in combination with the twisting of a soft iron wire to bind the loops together. A loop of ribbon is brought between two wires, the wires are twisted to hold the loop, another is brought between the wires which are again twisted, and the process is continued until the rosette blanks are formed.

The Cook patent granted November 7, 1950 relates to forming bows, rosettes and pom-pons from ribbon. There are a number of pegs on a turntable. Ribbon is withdrawn from a supply roll and as the turntable rotates, a loop is formed around a peg. The action is repeated by opposing pegs for a predetermined number of revolutions whereupon the bow is tied and then released from the pegs.

The loops which are described in the Webb Patent are not twisted. The Webb patent, in my view, is not even close to the patent in question. In the Webb patent there is no successive application of material along a continuous length of ribbon to a single rotary loop retaining means to form successive loops, nor are the loops in turn twisted between successive applications of ribbon to form a completed bow having radiating loops. Also, ribbon is not impaled on a retaining means in the Webb patent.

The Cotton patent does not reveal a machine which twists loops of ribbon. ribbon is not impaled and the retaining means does not function to hold the ribbon at a central point from which loops radiate.

In the Cook patent there is no twist in the loops formed by the machine. The ribbon is not impaled and the retaining means does not function to hold the ribbon at a central point from which the loops radiate.

While the star bow formed by the machines of the '223 patent has twisted loops, the pom-pon bow has no twist imparted to its loops. This distinction does not lend any weight to Berwick's contention of obviousness of the '223 patent because, as discussed above, the differences between the prior art and the machine of the '223 patent bear on facts other than whether or not the prior art machines twist loops of ribbon.

Neither Webb nor Cook were cited in the proceedings in the patent office which ultimately culminated in the issuance of the '223 patent. They are, however, in the same sub-class 46 of class 223 (coincidentally the last three digits of this particular patent) as the '223 patent. We are obliged to assume that the patent office examiners considered the references in the particular subclass 46. Uarco, Inc. v. Moore Business Forms, Inc., 440 F.2d 580, 585 (7th Cir. 1971). See also Layne-New York Com-

pany, Inc. v. Allied Asphalt Company, Inc., 501 F.2d 405 (3d Cir. 1974).

The patent office considered during the prosecution of the '223 patent application patents 2,312,645 (Huber); 2,-528,622 (Teemsma); 2,542,222 (Welch); 2,563,678 (Gates); 2,666,249 (Ruiz); Re. 23,835 (McMahon); 2,681,525 (James); 2,763,080 (Welch); 2,774,164 (James), 2,806,313 (James); 2,841,905 (Wanchek); 2,872,086 (Duncan) and 2,884,169 (Sperry). The prior art patents show attempts by inventors to devise machines and methods for forming decorative bows.

The machines depicted in 3M's '223 patent found considerable success in department stores. Thereafter machines with greater speed were developed and the demand for the decorative bows which are the subject of this suit increased over the years.

3M during 1958 produced and marketed a hand operated bow-forming machine which utilized a hand inserted collar button type pin as a loop retaining means. The first machine was known as the S–70. In late 1958 or early 1959 3M developed the S–71 which operated by use of a hand crank to move the feed means instead of the S–70's pendulum for that purpose. The S–71 machine is the one illustrated in the '223 patent.

In the S–71, a plastic collar button pin is grasped by a chuck. At the front of the assembly on which the chuck is mounted is an annular sleeve. In the S–70 the annular sleeve was metallic; in the S–71 and in later models it was rubber to achieve greater friction and thus prevent motion between the ribbon and the machine.

The S–71 made both star and pom-pon bows. Another model, the S–72 could produce only star bows. A power pack was then designed by 3M which replaced all of the hand operations except that an operator still had to introduce the plastic collar button pin into the chuck and eject it by hand.

3M's S–71 and S–72 were used not only in retail establishments such as gift shops and department stores but were also used in factories which commercially produced gift wrapping. The S–72 is still being sold and is priced at about $100.00. Between 1965 and 1971 3M sold 29,447 S–72 machines, capable of producing 70 million star bows annually.

One of the commercial bow-making methods used before the '223 patent was that developed at Chicago Printed String Co. (CPS) by its inventor, Gustav Wanchek, who testified at the trial in this case. CPS and Wanchek used pre-punched ribbon which was threaded onto another ribbon or string having a stop at its end and against which the pre-punched ribbon was forced to form loops.

3M itself had a pre-'223 bowmaker in the so-called S–10 which made hanks of ribbon and notched the same for easy tying into permanent hanks. After the hank was made and tied, the individual loops were manually pulled out to form a bow. Neither the Wanchek-CPS method nor the 3M S–10 method produced bows in industrial quantities for commercial giftwrapping.

In 1958 the Facile corporation, now Sun Chemical, entered the field. It utilized pre-punched ribbon like that described in the Wanchek patent. Facile used jigs to hold the loops which were then stapled. Facile was the first to use staples to hold the loops together. Wanchek had used a string and 3M had used a sharpened collar button type pin for this purpose. Facile developed its own machine for pre-punched ribbon which operated generally along the same lines as the machine described in the '223 patent.

The method of bow formation described in the '223 patent would not have been obvious to one skilled in the method of bow formation taught by the Wanchek patent. In the bow of the Wanchek patent the disposition of loops on different radii and the twisting of loops in the star bow take place as the last step of bow formation after all the loops have been made. In the bows of

the '223 patent the placement of loops on different radii and the twisting of the loops in the star bow take place contemporaneously with the formation of each loop on the central holding means.

The apparatus and the method described in the '223 patent were not obvious to those working in the art prior to 1957. They were not obvious in 1958 to Facile whose design manager testified at the trial that no method of forming these bows without the use of prepunched ribbon ever occurred to him until he observed one of 3M's machines. The patents before the '223 patent do not suggest an apparatus or a method of mechanically forming decorative bows from a succession of loops generated by impaling a ribbon on a loop retaining device, rotating the retaining device to twist the ribbon within the loop being formed, impaling the ribbon again to close the loop and repeating the operation to form as many loops along various radii as are required.

It would not have been obvious to one of ordinary skill in the art from any or all of the Cotton, Webb and Cook patents and the other patents in evidence to employ the method or the apparatus of the '223 patent. See Arrow Safety Device Co. v. Nassau Fastening Co., 496 F.2d 644 (3d Cir. 1974).

Berwick has failed to sustain its burden of proving the claims 1, 2, 5, 14, 15, and 17 of the '223 patent are invalid.

### 3. *Infringement of the '223 Patent.*

■ The Plaintiff contends that apparatus claims 1, 2, 5, and 17 are infringed by all of Berwick's machines and that method claims 14 and 15 are infringed by all of Berwick's machines save the Camberloc which manufacturers only pom-pons. Apparatus claims 1, 2, and 17 are embodied in claim 5 and counsel for 3M at the trial stated that the Court could confine its attention, as far as apparatus claims are concerned, to claim 5. The machines which have been used by Berwick since June 25, 1971 in the manufacture of decorative bows have been the Tye-Sil, Wanchek, Bowmatic, and Camberloc. 3M's claims prior to June 25, 1971 have previously been held to be barred by 3M's laches. Minnesota Mining and Manufacturing Co. v. Berwick Industries, Inc., *supra.*

3.1 The '223 Apparatus Claims with Respect to the Wanchek, Tye-Sil and Camberloc Machines.

Berwick denies infringement on the ground that none of its machines has elements as described in the '223 patent.

Each of the machines used by Berwick has (a) a shaft for supporting the supply roll of ribbon, (b) a ribbon feed means and (c) a loop retaining means. These are the essential elements of the machine described in claim 5 of the '223 patent. In the cam drop off type such as the Wanchek and Tye-Sil machines, for example, a shuttle withdraws ribbon horizontally, and then moves up a cam from which it drops to apply the ribbon to the retaining means. In each of these machines, the ribbon in the ribbon guide is brought to stationary needles for impalement thereon. The three machines thus perform the same functions in substantially the same manner as the machines described in the '223 patent. They also produce the same result. When considering infringement of the apparatus claim, comparison must be made between the structural elements of Berwick's machines and the inventive concept as defined in the claims set forth in the '223 patent.

Berwick's denial of infringement of the '223 patent by the Wanchek, Tye-Sil and Camberloc machines is directed chiefly to the argument that the ribbon in its machines is not held in a fixed position on the retaining needles in contrast to the firmness with which the ribbon is held on the retaining collar button pin of the machine actually described in the '223 patent. The '223 patent indicates that the purpose of having the ribbon in a fixed position on the retaining means is to cause the ribbon to rotate with the retaining means and to dispose the loops. Any slight move-

ment of the ribbon in Berwick's machines after impalement does not bear on this question. The ribbon on these Berwick machines is fixed to the loop retaining means as securely as it is fixed on the collar button pin depicted in the patent.

All of these Berwick machines retain ribbon in a fixed position on impaling needles. Berwick's Wanchek, Tye-Sil and Camberloc machines have all the essential elements and functions described in the '223 patent. Hence, the requisite equivalency exists between the Wanchek, Tye-Sil and Camberloc and the invention described in the '223 patent to make out an infringement.

3.2 The '223 Apparatus Claims with Respect to the Bowmatic Machine.

We turn now to the question of whether the Bowmatic machines violate claims 1, 2, 5 and 17. The Bowmatic is a highly advanced solid state circuitry machine of tremendous production capacity. The Bowmatic causes the ribbon to be withdrawn and advanced by a double roller mechanism, not a shuttle. The Bowmatic does not use a pendulum or a cam drop off device to impart a horizontal or downward motion to the ribbon. The Bowmatic raises the needles of the loop retaining means through the ribbon as it is advanced by the ribbon feed means. In my view, the Bowmatic cannot be said to fit within the language of claim 5 which provides that "said feed means operating to withdraw a continuous length of ribbon from a supply roll mounted on said shaft and successively to apply portions of ribbon spaced along said continuous length against said retaining means successively to form radiating loops of ribbon. . . . " Clearly, in the Bowmatic, the feed means simply does not successively apply portions of ribbon to the retaining means.

In the Bowmatic, the ribbon feed means composed of a drive wheel and an idler withdraws the ribbon. In the Bowmatic, the ribbon guide is stationary and the needles are brought by the spin-

dle to the ribbon. The application is not by the feed means, but is by the rotating loop retaining means.

The plain fact is that the Bowmatic does not fall within the retiary language of claim 5, although undoubtedly claim 5 could have been drafted to cover the Bowmatic machine. However, the draftsman of claim 5 was content to describe a machine in which the ribbon feed means impaled the ribbon on the loop retaining means. This is simply not so in the Bowmatic machine.

3M takes the position that the needle spindle in the Bowmatic machine should be regarded as part of the ribbon feed means on the theory that it is the retaining means which is to be fed in accordance with the invention of the '223 patent and without the reciprocation of the needle spindle in the Bowmatic the ribbon would never reach its destination but, instead, would be spewed onto the floor. 3M further contends that the phrase "ribbon feed means" is defined by the claim itself to involve more than merely moving ribbon into the machine and that the retaining means is specified as the part to be fed. On this theory "ribbon feed means" is said by 3M to be defined by the claim to encompass those means which both withdraw ribbon and successively apply it to the retaining means. It is 3M's contention that in the Bowmatic the reciprocation of the spindle fulfills the second (applying) function recited in the claim and therefore the reciprocal movement of the spindle forms part of the ribbon feed means. We reject this argument for the above reasons.

3M also contends that the transposition of motion in the Bowmatic illustrates the concept known as "kinematic inversion." 3M illustrated thte principle of kinematic inversion at the trial by use of one of its hand powered machines. When the pendulum lever and the ribbon guide were held stationary and the remainder of the machine was permitted to move freely, turning of the hand crank resulted in movement of the

loop retaining means to the ribbon portion and fulfillment of the ribbon application function. In both configurations, normal and inverted, the hand machine operated in the same fashion and produced the same bow.

■ 3M takes the position that transposition of motion and function between cooperating components in the Bowmatic is an example of equivalency which is insufficient to avoid infringement. The Court's attention is called by 3M to Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929), relating to latches for refrigerator doors. The patent in that suit claimed a latch in which the latch lever's cam rode over a lug on the door frame. The accused latch had a cam on the door frame and the lug on the latch lever. The transposition of function was found to be an equivalent and an infringement.

Although there is an identity of result between the Bowmatic and the S–70 and its progeny there is clearly no identity of means and operation. Both systems produce star bows through a similar sequence of events. Claim 5, even read broadly, simply does not describe the Bowmatic machine and thus the similarities fall short of equivalency. There are essential differences between the two systems. The Bowmatic performs the same or similar functions as the S–70 and its progeny, but in a substantially different way and thus does not infringe. Sylvania Electric Products Inc. v. Brainerd, 369 F.Supp. 468 (D.C.Mass.1974) and cases cited therein.

There is no literal kinematic inversion of the S–70 in the Bowmatic because there is no mere transposition of parts or function. The Bowmatic has a continuous double roller drive feed means which is not present in any other machine and is a substantial advancement over the pendulum lever. In our view, the kinematic inversion argument is ineffective with respect to the Bowmatic because the draftsmen of claim 5 specifically described a machine from which the Bowmatic differs in at least one substantial respect.

■ Berwick places great stress on the staggering speed with which the Bowmatic is able to produce star bows in contrast to the production rate of the S–70, S–71 and S–72. The S–71 with an operator working at maximum efficiency over an 8-hour shift is able to achieve the following production rates:

170 15-loop star bows per hour

120 25-loop star bows per hour

The Bowmatic can produce 1750 12-loop star bows per hour. Although the speed of the Bowmatic alone does not suffice to avoid infringement of the '223 patent, its speed is some indication of the successful utilization of substantial advancements in the Bowmatic, namely, a continuous roller ribbon feed drive and reciprocating retaining means.

We conclude that all of Berwick's machines, except the Bowmatic, violate the apparatus claims of the '223 patent.

3.3 Possible Restriction of the Broad Claims of the '223 Patent to the Machine Illustrated in the Patent.

■ Berwick contends that "retaining means" in claim 5 refers to the collar button type pin. The patent claim, however, not the description in the specification, is the measure of the invention. Schmidinger v. Welsh, 383 F.2d 455 (3d Cir. 1967).

The '223 patent illustrates a sharpened collar button type pin and cooperating sleeve as being the "loop retaining means." When the bow is completed, the bow and the pin are ejected from the machine and a new sharpened collar button pin is inserted in the chuck. In the Defendant's machines, no collar button pin of any type is used either in the making of the bow or in the completed bow. In the machines used by the Defendant, needles retain the loops during the manufacture of the bow and a staple affixed at the very end of the manufacturing process keeps the bow in shape. The feed means in the '223 patent propels the ribbon onto the sharpened collar

button pin. None of Berwick's machines uses this method.

The claims sued on here by 3M define the retaining means in broad terms whereas claim 4 of the patent, which is not in suit, specifically calls for a removable pin. A comparison of claim 4 with the claims in suit is a proper procedure under Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935). Such a comparison demonstrates that a collar button type pin is not the retaining means required to be considered in claim 5.

Infringements of claim 5 by all of Berwick's machines except the Bowmatic are not avoided by the use of needles and the staple or by the cam drop off shuttle rather than the pendulum. The needles, the staple, and the cam drop off shuttle all fall within the language of the claim and they perform the same functions in substantially the same way and accomplish the same result. They therefore infringe. Trio Process Court v. L. Goldstein's Sons, 461 F.2d 66 (3d Cir. 1972).

3.4 The '223 Method Claims with Respect to the Camberloc, Wanchek, and Tye-Sil Machines.

3M does not contend that the Camberloc infringes the method claims of the '223 patent.

In the manufacture of star bows by the Tye-Sil amd Wanchek machines, the ribbon is grasped initially at two points, one at the retaining needles and the other at the ribbon guide. When the needles are rotated, the ribbon is twisted between the needles and the guide. When the shuttle drops off the cam in the cam drop-off Tye-Sil and Wanchek machines the ribbon in the guide is applied to the needles. After the piercing by the needles, the ribbon in these machines is brought together at the free end and the spaced point in un-creased intersections in face to back relationship and one conoidal loop is formed. The loop is variously referred to in the pertinent patent documents as conical, conoidal and concoidal.[2] The legs of the first loop are fastened together by the impalement and subsequent loops are formed by a repetition of these steps.

The Tye-Sil and Wanchek machines operate in the manner described in claims 14 and 15 in the '223 patent. An infringement is made out as to those machines. Graver Tank Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

3.5 The '223 Method Claims with Respect to the Bowmatic Machine.

As noted earlier both claims 14 and 15 of the '223 patent describe a method of bow formation by "grasping a length of strip material adjacent its free end and at a point spaced therefrom, unidirectionally twisting the portion of the ribbon between the points where grasped and bringing the strip material at said free end and at said space point together in uncreased intersecting face to back relation to form a first loop  . . . ." The Bowmatic machine does not perform the steps in claims 14 and 15. See finding of Fact # 107. The Bowmatic grasps the ribbon at its free end by impalement on the retaining needles but it does not grasp the ribbon at a spaced point. The ribbon in the Bowmatic lies in the ribbon guide but is not grasped by it. This is one of the factors in the Bowmatic machine which permits that machine to achieve incredible speed of production. The Bowmatic does not violate claims 14 or 15.

4. Validity of the '240 Patent.

The Court concludes that the '240 patent is invalid. The claims are

---

2. The nonce-word "concoidal" does not appear in "Webster's Third New International Dictionary" (1965), "The American Heritage Dictionary of the English Language" (1969), "The Oxford Universal Dictionary" (1933), or the "The Oxford English Dictionary," Compact (microprint) edition (1971), Supplement (1972).

set forth in the margin.[3] The only real difference between the bows of the '240 design patent and the bows of the Wanchek patent, 2,841,905, is the absence of pre-punched holes in the ribbon. On the first two occasions with respect to the application which ultimately resulted in the '240 patent, different patent office examiners rejected as unpatentable 3M's application on the ground that the absence of pre-punched holes is not a patentable distinction. Thereafter, a third patent examiner without any discussion whatsoever allowed the claims. A fourth examiner, and the last to act on the patent, determined that the lack of pre-punched holes was not a patentable distinction. These matters are treated more fully below.

### 4.1 File Wrapper Limitation on the '240 Patent.

The '240 patent was allowed solely with respect to the family type bows

3. We claim:

1. A decorative bow comprising a continuous length of strip material formed into a succession of loops radiating from a generally central point along at least three radii, said length terminating with its ends adjacent opposite surfaces of the bow defined by said loops, said loops each having a first leg, a second leg overlying the first leg at said central point and a bight with each loop having one leg common with the opposite leg of each loop in immediate succession therewith, each of said loops having therein a unidirectional twist with the bight thereof being smoothly arcuate, the same surface of said strip material being exposed outwardly in each loop, the superposed layers of said strip material at said central point being impaled by central holding means which penetrates said layers and retains said loops together at said central point, the strip material of said layers being laterally displaced in areas immediately adjacent said holding means.

2. A decorative bow comprising a continuous length of strip material formed into a succession of loops radiating from a generally central point along at least three radii, said length being free of spaced predisposed holding member receiving apertures and terminating with its ends adjacent opposite surfaces of the bow defined by said loops, said loops each having a first leg, a second leg overlying the first leg at said central point and a bight with each loop having one leg common with the opposite leg of each loop in immediate succession therewith, each of said loops having therein a unidirectional twist with the bight thereof being smoothly arcuate, the same surface of said strip material being exposed outwardly in each loop, the superposed layers of said strip material at said central point being impaled by central holding means, which penetrates said layers and retains said loops together at said central point, the strip material of said layers being laterally displaced in areas immediately adjacent said holding means.

4. A decorative bow comprising a continuous length of strip material formed into a succession of loops radiating from a generally central point along at least three radii, said length being free of spaced predisposed holding member reeciving apertures and terminating with its end adjacent opposite surfaces of the bow defined by said loops, said loops each having a first leg, a second leg overlying the first leg at said central point and a bight with each loop having one leg common with the opposite leg of each loop in immediate succession therewith, said loops having therein a unidirectional twist with loop legs being creased adjacent said central point and with the loop bights being smoothly arcuate and of generally uniform curvature across the width thereof, the same surface of said strip material being exposed outwardly in each loop, the overlying layers of said strip material at said central point being impaled by central holding means which penetrates said layers and retains said loops together at said central point, the strip material of said layers being laterally displaced in areas immediately adjacent said holding means.

5. A decorative bow comprising a continuous length of strip material formed into a succession of loops radiating from a generally central point along at least three radii said length being free of spaced predisposed holding member receiving apertures and terminating with its ends adjacent opposite surfaces of the bow defined by said loops, said loops each having a first leg, a second leg and a bight with each loop having one leg common with the opposite leg of each loop in immediate succession therewith, each of said loops having therein a unidirectional twist with the bight thereof being smoothly arcuate, the same surface of said strip material being exposed outwardly in each loop, and central holding means retaining said loops together at said point.

shown in figures 1, 2 and 4 of the patent. Figure 5 of the patent is a star type bow and figure 6 is a pom-pon type bow. The patent should be restricted to family type bows. A brief summary of the events in the patent office follows. The matters are set forth *in complete detail in findings of fact numbered 143, 145, 147, 150–152 and 154 and are here summarized for purposes of the present discussion.*

On January 20, 1960, a patent office examiner rejected the claims of the '240 patent as unpatentable over James and Wanchek. Finding of Fact # 143. On July 22, 1960, 3M amended the patent by inserting the language that the ribbon is "free of spaced predisposed holding member receiving apertures." Finding of Fact # 145. On March 13, 1961, the patent office rejected the application as unpatentable over Wanchek and James stating in substance that the elimination of the holes was not inventive and that the structure of the article was the issue. Finding of Fact # 147. The patent office stated that the action was *"final"*. 3M then appealed from the final rejection. On January 10, 1962, a different examiner allowed the claims by this cryptic language: "Responsive to appeal brief filed December 13, 1961."

> "Upon reconsideration and in view of applicants' arguments as presented in their appeal brief filed December 13, 1961 claims 1 to 3 and 19 appear allowable."

Finding of Fact # 150. Plaintiff's Exhibit 1 page 85 (January 10, 1962).

The brief filed December 13, 1961 by 3M stressed patentability by reason of the ribbon "being free of spaced predisposed holding member receiving apertures." This is the draftsman's obtuse phraseology for lack of evenly spaced holes. While 3M's brief stressed the lack of holes, it did not abandon other alleged structural distinctions between its bows and the Wanchek and other prior art bows. None of these, however, *are of any weight.*

On April 4, 1962, notice that the patent was allowable for issuance was sent to 3M. 3M did not pay the fee for the patent and the application was considered abandoned. The forfeiture notice was sent by the Patent Office on November 19, 1962. On June 26, 1963, 3M filed a preliminary amendment, cancelling old claims 2, 4, 6 and 7 without prejudice and proposing to add a new claim. On July 3, 1963 Examiner Steinberg, referring to the James and Wanchek patents, found as follows:

> "Claims 8 and 9 are rejected as unpatentable over Wanchek, taken above, or in view of James. The structure set forth in claims 8 and 9 reads on figure 17 of applicants, which in turn reads on figure 3 of Wanchek. The limitation that the ribbon be free of apertures is not a patentable distinction. Apertures must of necessity be present in both instances. The particular shape of the loops is merely a matter of choice and design. Furthermore, concoidal (sic) shapes are old as shown in James."

> "Claims 1, 3 and 5 which read on the shapes shown in figures 1 and 15 are deemed allowable.

> "Claims 8 and 9 stand rejected.

> "Claims 1, 3 and 5 are allowed."

The claim numbers referred to by Examiner Steinberg, 1, 3 and 5 reading on figures 1 and 15 are reflected in the '240 patent respectively as claims 5, 3 and 2 *reading on figures 1 and 4. Both* of these figures relate solely to family bows. On July 10, 1963, counsel for 3M filed an amendment which cancelled old claim 9 and substituted a new claim 10 which ultimately wound up in patent '240 as claim 1. It is the same as old claim 5, which is now claim 2 of the patent, except that old claim 10, present claim 1, omits the language "being free of spaced predisposed holding member receiving apertures." Since the present claim 1 is the same as old claim 5 except for the absence of holes, present claim 1 must relate also to family type bows.

On September 25, 1963, the patent office sent its notice of allowance of the patent application. Finding of Fact # 154. After the July 3, 1963 determination by the patent office, there was no modification or reversal of its action whatsoever and the breadth of the patent must be determined by an examination of the July 3, 1963 action. The September 25, 1963 notice of allowance covered five claims which would be the five now shown in the patent and included claim 10 of the amendment of July 10, 1963, now claim 1.

A careful tracking through the maze-like patent documents conclusively shows that only star bows of the family type are covered by the '240 patent and those are not at suit. A star bow of the non-family type is depicted as figure 5. No claim was ever allowed with respect to this type of bow.

Although on a cursory examination, the claims of the '240 patent would appear to cover a Wanchek-type star bow, a close examination of the file wrapper and attention to the history of the entire proceedings in the patent office show that the invention is restricted to the family type bows regardless of figure 5.

■ Claims of a patent must be interpreted by considering cancelled or rejected claims. Nickerson v. Bearfoot Sole Company, Inc., 311 F.2d 858 (6th Cir. 1963). "[A]n allowed claim may not be read to cover what has been eliminated from the patent." Nickerson v. Bearfoot Sole Co., Inc., at p. 876. The Bearfoot principle applies aptly to this case.

4.2 Obviousness of the Invention Disclosed in the '240 Patent.

Even aside from the file wrapper history of the '240 patent, said patent is invalid as obvious. As we have stated previously, the test of obviousness is whether "the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

The bow shown in figure 1 of the James Patent 2,806,313 is exceptionally similar to the multi-pointed star bow shown in Figure 5 of the '240 patent except that the James bow has a ball to simulate the corona of a natural flower and a split brasspin as the central holding device.

The only basic difference between the Wanchek bows and the 3M bows is the absence in the 3M bow of pre-punched holes. In our decision on Defendant's motion for summary judgment where the Defendant relied heavily on Amerline v. Cosmo Plastics, 271 F.Supp. 215 (N.D.Ill.1967), we declined to apply Amerline because it had been decided after a full trial on the merits and our case was only at a preliminary stage. We have now had the full trial on the merits. The conclusion of the Court in *Amerline* that the absence of holes is not a patentable distinction is well taken and is applicable to this case. Absence of holes in the ribbon is only a matter of ordinary engineering design and would have been obvious to one skilled in the relevant art within the meaning of 35 U.S.C. § 103. In both cases, there are holes in the ribbon. In the Wanchek patent, the holes are pre-punched and in the 3M patent the holes are made by impalement of the ribbon on the loop retaining means. When the holes are made, whether in advance of the making of the bow, or at the time of the making of the bow, goes only to method and the '240 is a design patent, not a method patent.

The Wanchek patent and the James patent 2,806,313 disclosed a pin as a central fastening device. A person with only ordinary skill in the art could take ribbon and fashion it either over a central holding pin as in James or by threading it as in Wanchek into a bow such as the bow described in the '240 patent. One skilled in the prior art and aware of both Wanchek and James pat-

ents could easily have made the bows described in the '240 patent.

There is a rebuttable presumption in favor of the 3M patent and Berwick has the burden of establishing invalidity by clear and convincing proof.

From the testimony in this case as to the number of patent applications filed annually, the number of patent applications granted annually, the number of employees in the patent office, and the lack of adversary proceedings, the weight to be given the presumption of validity must be questioned. Furthermore, there appears to be an ability on the part of patent counsel, illustrated by this case, to apply and reapply, then re-reapply on precisely the same points and, despite numerous rejections by various patent examiners, finally locate one patent examiner who authorizes the grant. The ultimate grant by one patent examiner effectively nullifies the rejection by other patent examiners and the lack of adversary proceedings in the patent office brings the process to an end at the time of the grant. Had 3M paid the patent fee promptly after the third examiner had nullified the action of the first two examiners, no fourth examiner would ever have entered the picture and the old claims 8 and 9 would never have been rejected. The patent applications and claims in this case are paradigms of semantic frolic. The third examiner in the patent office, in particular, placed greater weight on language variations than on differences in the actual design of the bows. In our view, Berwick has proven the 3M '240 patent to be invalid by clear and convincing proof.

■ The commercial success incident to the tremendous production of star bows and pom-pon bows may be attributable to improvement in the machine and method, duly reflected in the '223 patent, but that commercial success certainly cannot be attributed in any way to the design of the bow under the '240 patent which is actually the same as the design under the Wanchek patent. The

success is attributable to high speed production. Commercial success may be entitled to some consideration where there is doubt as to the validity of the patent. Continental Can Co. v. Old Dominium Box Co., Inc., 393 F.2d 321 (2d Cir. 1968). In this case, there is no doubt that the '240 patent is invalid.

5. Further Support for the Court's Previous Findings of Laches Against 3M.

The Court previously found the Plaintiff guilty of laches. At the trial of that issue the Court was unaware of certain documentary evidence proving that 3M knew Defendant to be in the business of making bows in 1965. At the trial on the merits of this case it developed that on October 15, 1965, Berwick wrote Christianson, a 3M licensee who manufactured Camberloc machines inquiring about acquisition of Camberlocs. Within less than a week, 3M's patent counsel had received from Christianson the original or a copy of Berwick's letter to Christianson. 3M's patent counsel immediately advised 3M to send Christianson a draft of a letter by which he would notify Berwick of the 3M patents which are the subject of this suit. Berwick never received such a letter. This evidence further strengthens the conclusion of this Court in its findings with respect to 3M's laches. At least as early as 1965 3M knew Berwick was in the bow making business and did nothing to alert Berwick to 3M's '223 patent.

6. Berwick's Antitrust Counterclaim and Its Assertions of Equitable Estoppel Against 3M.

Berwick claims that this suit is without warrant and constitutes conduct in restraint of trade. Berwick seeks treble damages and attorneys' fees.

■ There is no evidence that 3M has considered its claim against Berwick to be without merit. While 3M deserves condemnation for its failure to move against producers much earlier than it did, such failure does not give rise to an inference that 3M has attempted to monopolize the bow making industry. 35

U.S.C. § 271(d) provides that no patent owner shall be denied relief or be deemed guilty of misuse of his patent by reason of his having sought, inter alia, to enforce his patent rights.

Berwick also claims that the institution of this suit prevented it from obtaining a substantial contract. While it is possible that the suit may have had some effect, particularly because of the claim for an injunction, the evidence falls short of convincing this court that Berwick lost the contract because of this litigation. The fact that Defendant's banks and factors inquired with respect to this litigation does not prove that Berwick's credit was damaged by reason of the litigation.

In addition, Berwick objects to 3M's approach to settlement of this litigation, the filing of a continuation application with respect to the '240 patent and 3M's desire to sell its ribbon for use by bow producers covered by the '223 and '240 patents.

With respect to the settlement negotiations, Berwick was originally offered a license at $180,000, the same figure at which Sun was granted a license. Berwick rejected the offer because its production was substantially lower than Sun's. This suit was instituted and thereafter Berwick attempted further negotiations. At that time, 3M officials increased the price from $180,000 to $225,000 plus interest from 1971 to the date of the negotiations in 1973. While 3M would not be expected to know with precision the production of Sun and Berwick respectively, it was in a position to make a reasonable approximation of the differences in production between Sun and Berwick. The increase of 25% in the price of the license to Berwick has all the hallmarks of arbitrary conduct. However, we are not aware of any case holding that such conduct is illegal.

The Court rejected Berwick's estoppel defense subsequent to the first hearing in this case on that issue and on the laches issue. The evidence accumulated as a result of the hearing on Berwick's liability has not convinced the Court that its rejection of the estoppel defense was in error.

Berwick fails to sustain its burden of proof on its antitrust counterclaims and Berwick's defense of equitable estoppel is likewise rejected as unproven.

7. Damages.

At the start of the trial on Berwick's liability, which was subsequent to the hearing on the issues of laches and estoppel, 3M requested that the issue of damages be resolved in yet a third hearing to be held at some future date. Berwick opposed 3M's request for a separate damage hearing stating that the increased costs of litigating damages separately would cause it severe hardship. Berwick's outlay for counsel fees and expenses through the laches issue alone and up to but not including trial on the liability issue was $101,000. This case calls to mind William Camden's admonition, "Agree, for the law is costly." [4]

The Court considered the age of this case, the relative simplicity of the damages issue, and the prejudice to Defendant from extending this lawsuit, and decided to hear the damages issue along with the issue of Berwick's liability. Ample evidence was presented for the Court to make a fair award on damages. See Findings of Fact Paragraphs 181–192 relating to damages.

The guidepost to damages in a patent case is 35 U.S.C. § 284 which provides that upon a finding for the claimant damages shall be awarded "but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs . . . ." Where appropriate, a successful claimant may also be entitled to an injunction against the infringer. Although 3M in its complaint sought to enjoin Berwick's use of the 3M patents, 3M subsequently abandoned that avenue

4. "Remains" p. 316 (1605).

of relief. See 3M's Proposed Conclusions of Law ¶ 45.

In Minnesota Mining and Manufacturing v. Berwick Industries, Inc., *supra*, this Court held that 3M would be barred from recovering damages for the period before June 25, 1971 because of 3M's laches. As a result of the Court's finding, the reasonable royalty which Berwick is required to pay 3M must be computed for the period from June 25, 1971 through the expiration of the patent.

3M has entered into two types of licenses under its two patents. The first type provides for royalty calculated on the basis of the number of bows produced and sold by the licensee. That royalty was set at two-tenths of a cent ($.002) per bow although several special licenses were granted in which the royalty was reduced to eight hundredths of a cent ($0.0008) per bow. The second type of license provided for a lump sum royalty which was not specifically geared to actual bow production.

Only one lump royalty arrangement was ever entered into by 3M and that was with Sun Chemical Corporation in 1971. That royalty was for $180,000 payable in 6 equal installments without interest over the remaining life of the patent. The license agreement covered all past and future use of the 3M patents and was entered into by Sun in the face of imminent litigation by 3M against Sun. 3M was able to make a reasonably accurate estimate of Sun Chemical's rate of bow production in 1971 in negotiating the royalty. 3M was also familiar with Berwick's rate of production in 1971. Sun Chemical has a bow production capacity which is two to three times that of Berwick although I do not consider that factor important. Berwick's production for 1971 was 100,000,000 bows which at the rate of $.002 per bow would involve an annual royalty alone of $200,000.00. Even if Berwick had conceded that its Wanchek, Tye-Sil and Camberloc machines infringed and 3M had conceded that the Bowmatics did not infringe, both concessions reflecting the conclusions reached by the Court in this case, the two-tenths of a cent per bow royalty would probably have exceeded $180,000 over the remaining life of the patent. Obviously, these parties in 1971 would not have entered into any license agreement other than one involving a lump sum royalty.

■ The Court must determine what is a fair lump sum royalty under all the circumstances. Where a patent owner has granted licenses at different rates, the lowest rate, in the absence of contrary evidence, constitutes a reasonable royalty. Russell Box Company v. Grant Paper Box Company, 203 F.2d 177, 182, 183 (1st Cir. 1953); American Sulfite Pulp Company v. DeGrasse Paper Company, 193 Fed. 653 (2d Cir. 1912). Thus, the $180,000 is a fair starting point. The Court should not be precluded from using the lump sum as a basis and forced to consider only a royalty based upon a rate per bow. Both Sun and Berwick are major producers in the field. The $.002 and $0.0008 per bow royalties have been paid 3M by companies whose production is minor, even miniscule, when compared with Sun and Berwick. These per bow royalities thus do not seem to me to be a fair basis from which to proceed to a determination of an equitable royalty in this case.

Berwick's use of the '223 patent is only by the Camberloc, Tye-Sil and Wanchek machines and these machines produced 16.54676% of Berwick's bows in 1973, the latest years for which we have figures. 35 U.S.C. § 284 requires that damages be awarded not less than a reasonable royalty *for the use* made of the invention by the infringer. A reduction in the royalty to reflect only the use of infringing machines seems reasonable, as does a reduction to eliminate recovery by 3M for the period in which it is barred by laches. The royalty figure to be arrived at by the Court does not include a reduction for the invalidity of the '240 patent. The '240 patent is not

susceptible of precise monetary valuation and probably has little value absent its relationship to the '223 patent. No reduction in the royalty should be made for Berwick's gross production being somewhere between ⅓ and ½ of Sun's production because 3M offered the royalty arrangements to interested parties and absent an abuse of its right so to do 3M was not obliged to tailor each lump sum royalty offer to the particular licensee's production.

■ The Sun Chemical license was executed April 20, 1971 and not only covered use to the expiration of the patent on April 19, 1977 but also covered all claims for past manufacture. Applying the applicable six-year statute of limitations, 35 U.S.C. § 286, the period covered by the Sun license was April 20, 1965 to April 19, 1977. Berwick should pay a royalty geared to the proportion which the duration of its use of the patent bears to the period for which Sun paid compensation. Further, Berwick's royalty should involve a factor which reflects that only a small portion of its bows are made on infringing machines.

Applying these considerations, a fair formula for a reasonable royalty and the calculation thereof are as follows:

$$\text{Reasonable Royalty} = \frac{\text{Sun's royalty}}{1} \times \frac{\text{Berwick's License Duration}}{\text{Sun's License Duration}} \times \frac{\text{Berwick's 1973 Infringing Production in Bows}}{\text{Berwick's 1973 Total Production in Bows}}$$

$$" \quad " = \frac{\$180,000}{1} \times \frac{6/25/71\text{--}4/19/77}{4/20/65\text{--}4/19/77} \times \frac{17,250,000 \text{ bows}}{104,250,000 \text{ bows}}$$

$$" \quad " = \frac{\$180,000}{1} \times \frac{299 + 5(365) + 1 \text{ days}}{364 + 11(365) + 3 \text{ days}} \times \frac{17,250,000 \text{ bows}}{104,250,000 \text{ bows}}$$

$$" \quad " = \frac{\$180,000}{1} \times \frac{2125 \text{ days}}{4382 \text{ days}} \times \frac{17,250,000 \text{ bows}}{104,250,000 \text{ bows}}$$

Reasonable Royalty = $14,443.49

The Sun royalty was payable in annual installments over the remaining life of the patent. Assuming that a similar provision would have been made in Berwick's case, the interest at 6% to today on the four installments due June 25, 1971 and annually thereafter is $1288.68. The commuted value as of today of the annual payments due June 25, 1975 and June 25, 1976, also using a 6% money rate, is $4,605.82 or $208.67 less than the face amount of $4,814.49. Subtraction of the commutation reduction from the interest yields a net interest factor of $1,080.01.

Judgment will be entered in favor of 3M and against Berwick for the amount of the reasonable royalty of $14,443.49 plus net interest of $1,080.01 or a total of $15,523.50.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following findings of fact:

1. The Plaintiff, Minnesota Mining and Manufacturing Company ("3M"), is a Delaware corporation with its principal place of business in St. Paul, Minnesota. [Prior Court Finding No. 1.]

2. Berwick Industries, Inc. ("Berwick") is a Pennsylvania corporation and has a regular and established place of business in Berwick, Pennsylvania. The alleged acts of infringement here

complained of have occurred primarily at Berwick's Pennsylvania facility and at its facility located in San Juan Bautista, California, sometimes referred to as Berwick's "West Coast Plant." [Prior Court Finding No. 2.]

3. United States Patent No. 2,933,323 was issued to 3M on April 19, 1960 on an application filed on behalf of Robert S. Kravig and Arnold E. Johnson on July 23, 1958. United States Patent No. 3,112,240 was issued to 3M on November 26, 1963 on an application filed on behalf of Robert S. Kravig and Arnold E. Johnson on October 4, 1962 which application was a continuation of an earlier application filed on October 29, 1959 as a division of the original application of July 23, 1958 which resulted in U.S. Patent No. 2,933,223. The applications for the patents were assigned by the inventors to 3M, and 3M has been the owner of U.S. Patents Nos. 2,933,223 and 3,112,240 since their respective dates of issuance. [Prior Court Findings Nos. 3 and 4.]

4. Patent No. 2,933,223 (hereinafter referred to as the '223 patent) relates to a method and apparatus for forming decorative bows from continuous lengths of ribbon. Patent No. 3,112,240 (hereinafter referred to as the '240 patent) relates to decorative bows formed from continuous lengths of ribbon. [Prior Court Finding No. 5.]

5. The method and apparatus for fabricating decorative bows under the '223 patent and the bows per se of the '240 patent were initially the subject of a single patent application, Serial No. 750,396, filed on July 23, 1958. During the prosecution of that application, the Patent Office ruled that the bows were to be regarded as a separate and distinct invention from the method and apparatus for creating the bows, and, hence, ruled that the bow claims should be removed from the parent application and made the subject of a separate divisional application. This was done on October 29, 1959 by the filing of divisional application Serial No. 855,484. On October 4, 1962, a continuation application, Serial No. 228,491, was filed to replace the earlier divisional application, and the '240 bow patent issued as a result thereof on November 26, 1963. [Prior court finding No. 6; Plaintiff's Exhibit No. 1, Tab d, DeLaHunt's letter of October 28, 1959.]

6. Berwick is charged with having infringed claims 1, 2, 5, and 17 of the '223 patent by its use, since February 23, 1967, of Tye-Sil, Wanchek, Ragen Bowmatic and Camberloc bow machines, and with having infringed claims 14 and 15 of the '223 patent by its use, since February 23, 1967, of Tye-Sil, Wanchek and Ragen Bowmatic bow machines. Infringement of claims 1, 2, 4, and 5 of the '240 patent is alleged by reason of Berwick's manufacture and sale, since February 23, 1967, of bows made on the Tye-Sil, Wancheck, Ragen Bowmatic and Camberloc machines. [Prior Court Finding No. 7.]

7. Kravig and Johnson reduced their concept to actual practice in 1957, when a prototype machine, having a hand-operated, pendulum-type shuttle with a one-way ribbon gripper and ribbon guide for withdrawing ribbon from a supply roll, was created. In forming the loops of the bow, ribbon was impaled upon a plastic pin which was removably mounted in a horizontal, rotatable spindle. [Johnson, Vol. VI, pp. 9–10, 90–91.]

8. 3M's initial interest in the Kravig and Johnson device was to provide a relatively inexpensive, hand-operated machine for use in the retail market, such as in department stores and other retail outlets. In 1958, 3M introduced its first commercial embodiment of the Kravig and Johnson concept, the so-called S–70 machine. This machine, like the earlier prototype, was hand-operated by a pendulum-type shuttle and employed a removable plastic pin. [Johnson, Vol. VI, pp. 15–16; PX 9.]

9. Later in 1958, 3M brought out an improved model known as the S–71 ma-

chine. Because the S–71 machine was the preferred physical embodiment of the Kravig and Johnson concept on July 23, 1958 when the original application for the patent in suit was filed, it is the machine that is depicted and described in the '223 patent. The primary improved feature in the S–71 was the substitution of a hand crank for the pendulum as the drive means for the shuttle. Both star and pom-pon bows could be formed on the S–71 as described in the '223 patent. [Johnson, Vol. VI, pp. 17–22; PX 1a, 9, 10a, 10b, 10c.]

10. Although designed for the retail market, the hand-operated S–70 and S–71 machines also found limited use in industrial markets. With the indication that the Kravig and Johnson invention could be used industrially, 3M in 1960 developed an automated, production-type bow machine known as the S–73. A prototype of the S–73 was successfully tested in the last half of 1960, and the machine became commercially available in 1961. [Johnson, Vol. VI, pp. 26–31; PX 12d; Prior Court Finding No. 8.]

11. Messrs. Kravig and Johnson, the inventors of the '223 patent, stated in an affidavit sworn to December 15, 1969, filed in the Canadian Patent Office proceedings, that the '223 patent was based upon the following claimed "original conception":

"To form a bow by impaling ribbon on a pin. This pin would serve to secure successive loops of ribbon together. This pin would remain as a part of the finished bow.

"To use this pin in a machine the elements involved would be to hold the pin in rotatable chuck and impale successive loops of ribbon. If the chuck was rotated a predetermined number of degrees between successive loops, a decorative bow could be formed. By varying the number of degrees of chuck rotation, bows of many types can be formed."

(Pltf's Exh. 56; T Vol. VI 7/8/74 pp. 36–41, 65–67, 73–92, Johnson; Vol. XIV 7/19/74 pp. 11–21, Johnson; Vol. XI 7/16/74 pp. 86–87, Howson; Vol. XII 7/17/74 pp. 23–29, Howson; Vol. XII 7/18/74 pp. 151–163, Kravig; Vol. XIV 7/19/74 pp. 2–7, Kravig)

12. The "original conception" referred to in the foregoing Finding (D-36) is fully embraced in Claims 3 and 4 of the '223 patent which are not in suit. [T Vol. XII 7/17/74 pp. 28–30, Howson.]

13. 3M thereafter, during 1958, produced and marketed a hand operated bow forming device utilizing the manually inserted collar button type pin which was designated as the S–70. This was followed by the S–71 in late 1958 or early 1959, which was essentially identical except that in place of a pendulum to move the ribbon feed, the S–71 used a hand crank with appropriate linkages. The S–71 hand crank machine, an improvement over the earlier prototype and S–70 machines, was the machine that was illustrated in the '223 patent and described in the specifications thereof. [T Vol. VI 7/8/74 pp. 16, 18–19, Johnson; Pltf's Exh. 1(a); State of Uncontested Facts Def's number B1.]

14. In 1961, 3M also provided, as an accessory for its S–71 hand machine, a power-pack which motorized the turning of the crank through a desired number of cycles until a completed bow was formed. When this power-pack was utilized with an S–71 (and later with the simplified S–72 machine), the only manual operations left for the operator to perform were the cut-off and ejection of the bow and the placement of a new plastic pin for the next bow. [Johnson, Vol. VI, pp. 32–34; PX 11.]

15. In 1964, 3M introduced a simplified version of the S–71, known as the S–72. The S–72 operated in the same manner as the S–71 except that the power was transmitted from the hand crank to the working parts of the machine by

a gear drive instead of pulleys, and the optional ability to form pom-pon bows was eliminated. The ribbon gripping device was also modified. The S–72 is still being sold. [Johnson, Vol. VI, pp. 32–34; PX 11.]

16. 3M is not engaged in the manufacture and sale of decorative bows described in the '240 patent. [Prior Court Finding No. 9.]

17. The subject matter of claims 1, 2, 5, 14, 15, and 17 of the '223 patent, and claims 1, 2, 4, and 5 of the '240 patent have been involved in legal proceedings previous to the instant action. The first such proceeding was Patent Interference No. 92,874 declared by the Patent Office on July 5, 1962 between such claims of the '223 patent and an application, Serial No. 98,043 filed December 28, 1960 by David J. Henderson (hereinafter referred to as the "Henderson Interference"). The second proceeding was a suit filed on March 29, 1965 by 3M in the United States District Court for the Northern District of New York, Civil Action No. 65–CV–134, charging infringement of the '223 and '240 patents by Henderson and his company, Aranac Ribbon Mills (hereinafter referred to as the *Aranac* suit"). [Prior Court Finding No. 42.]

18. About eight months after the '223 Kravig and Johnson patent was issued, David J. Henderson filed a patent application which described an automated production-type decorative bowmaking machine and a method for forming said bows. The Henderson machine is classified as a "cam drop-off" apparatus because ribbon is applied to the retaining needles by the downward motion of the shuttle as it falls off a cam. The cam drop off machine operates generally as follows: A shuttle upon which ribbon is carried moves forward on an incline and rides over a curved segment of a cam or switching device. When the shuttle or carrying devices reaches the end of the cam it falls off the end of the cam and drops down on the surface

of a horizontal track. The drop is the result of gravity permitting the free end of the carriage or shuttle to fall downward. A rotating spindle which contains sewing machine type needles is positioned so that as the carriage or table drops downward, the ribbon in a notched guide in the front of the dropping carriage or shuttle is impaled upon the needles. The shuttle or carriage then retreats away from the needles on a horizontal track and the cycle then commences again as the shuttle or carriage drives the cam back up the incline. The spindle in which the needles are held and upon which ribbon is now fixed rotates during periods when the shuttle is away from the rotating spindle. This procedure continues until sufficient loops are formed whereupon a stapling device comes down upon the needles which retract into the spindle by reason of the pressure of the staple, a staple is then fixed in the center portion of the bow and the finished bow is ejected as the staple device retreats. The needles then reappear for the purpose of forming the following bow. [T Vol. VII 7/9/74 pp. 62–63; Nimmo; Vol. XIV 7/19/74 pp. 58–60, Shaffer; Vol. VII 7/9/74 pp. 119–129, DeMoor; Vol. VII 7/9/74 p. 191, Benner.]

19. Along with the filing of his application on December 28, 1960, Henderson presented claims from the '223 patent here in suit. By letter dated February 16, 1961, Henderson informed the Patent Office that he had copied claims 1, 2, 5, 14, 15, and 17 from the '223 patent, and by letter dated May 8, 1961, he asked for declaration of a Patent Interference to determine that he, and not Kravig and Johnson, was entitled to those patent claims. On July 5, 1962, Interference No. 92,874 was declared by the U.S. Patent Office between claims 1, 2, 5, 14, 15, and 17 of Patent 2,933,223 and corresponding claims in application Serial No. 98,043 of Henderson. [Prior Court Findings Nos. 42 and 45.]

20. Henderson, in Interference No. 92,874, stated, in a required preliminary

statement under oath, that he had reduced the concept of the '223 patent to practice prior to Kravig and Johnson by making a machine on which he produced bows that are also claimed in the '240 patent. In a decision rendered August 18, 1965, priority of invention as to claims 1, 2, 5, and 17 of the '223 patent was awarded to Henderson by the Patent Office Board of Patent Interference on the basis that Henderson had proven a reduction to practice prior to 1957 of the invention including the manufacture of bows that are claimed in the '240 patent. That Board of Patent Interference's decision was reversed by the U.S. Court of Customs and Patent Appeals on May 16, 1968 which awarded priority to Kravig and Johnson. Kravig and Johnson v. Henderson, 393 F.2d 1017, 55 C.C.P.A. 1182 (1968). The Court held that Henderson did not sustain his burden of proving beyond a reasonable doubt the priority of his machine to the Kravig and Johnson mechanism. [Prior Court Findings Nos. 45, 47, 50.]

21. On March 29, 1965, 3M filed a patent infringement suit against Henderson and his company in the United States District Court for the Northern District of New York, entitled Minnesota Mining and Manufacturing Company v. Aranac Ribbon Mills and David J. Henderson, Civil Action No. 65–CV–134. The Plaintiff charged infringement of both the '223 patent and the '240 patent. The apparatus and method accused of infringement were essentially those described in the Henderson application which was involved in the Interference described heretofore. On August 14, 1970, a Consent Judgment was entered against David J. Henderson and Aranac Ribbon Mills for $20,000. The Defendants also consented to a permanent injunction being issued against them subject to suspension if the Defendants became licensees of 3M. The Consent Judgment also admitted validity and infringement of claims 1, 2, 5, 14, 15 and 17 of 3M's '223 patent and claims 1, 2, 4, and 5 of 3M's '240 patent. [Prior Court Findings Nos. 42, 51 and 54; PX 5c.]

22. Aside from the Henderson interference proceedings and the subsequent United States District Court litigation involving Henderson and Aranac Mills, the instant case is the only infringement suit brought by 3M against a decorative bow manufacturer. Moreover, no action throughout the years that have elapsed during the life of the 3M patents has been brought against any manufacturer of decorative bow producing machinery. [T Vol. XVII 7/24/74 pp. 85–86, DeLaHunt; Minnesota Mining & Manufacturing Co., supra, finding 42, p. 859.]

23. Ragen Precision Industries, Inc., manufacturer of the Ragen Bowmatic bow producing machine, whose use by Berwick allegedly infringes 3M's patents, was offered a royalty free license which Ragen refused to accept. Ragen is the largest producer of sophisticated decorative bow producing machines. These machines have enabled production of decorative bows with the greatest speed and volume. The bulk of the Ragen machines was sold after 3M's patent counsel and one of its principal officers, A. H. Redpath, had visited the Ragen plant and ascertained that Ragen had developed an automatic star bow maker which was one of the finest and speediest machines produced for the manufacture of such bows. [Minnesota Mining & Manufacturing Co., supra, Findings 58–60 pp. 861–862; T Vol. XVII 7/24/74 p. 86, DeLaHunt Vol. XII 7/17/74 p. 110, Lopata.]

24. Berwick, at least in part because of the absence of any suit or claim against any manufacturer of decorative bow producing machinery, invested a substantial amount of money in the purchase of bow producing machinery and in the expansion of its business activities in that field. [T Vol. XIII 7/18/74 pp. 40–41, 46, 104, Doherty; Minnesota Mining & Manufacturing Co., supra, Findings 16, 17, 27, 28, 29, 35–38, pp. 855–858.]

25. For some time prior to 1957, 3M manufactured decorative ribbon. The

company also developed a machine called the "S–10 Prefab Bowmaker" to assist customers in the creation of ribbon bows. The S–10 is the subject of 3M's U.S. Patent No. 2,872,086 (referred to simply as the Duncan patent). This machine employed a simple jig device whereby ribbon could be wound around two arms to form a hank of ribbon. The hank was removed by hand from the arms and inserted into another jig where it was held while two V-shaped notches were cut at opposite sides of the hank at its center. In a third operation, the notched hank was inserted in yet another jig to be held while a tie-string was knotted around the hank at the notched portion. A bow was then formed from the hank by manually pulling individual loops one at a time from the hank and arranging them along different radii from the tied center portion. The drawbacks of the S–10 were its lack of speed because of its manual operation and the requirement of operator skill needed in order consistently to form a good looking bow. [Johnson, Vol. VI, pp. 10–14; PX 3, Tab 30; PX 8a, 8b, 8c.]

26. Although utilization of decorative bows in conjunction with gift wrapping was common prior to the appearance of the Kravig and Johnson invention, there was little real commercial mechanization of the process of bow formation. U.S. Patents 1,209,525 (hereinafter referred to as Webb); 1,728,724 (hereinafter referred to as Cotton); 2,542,222 (hereinafter referred to as Cook, 222); and 2,775,377 (hereinafter referred to as Cook, 377) remained dormant in the prior state of the art but the invention of Kravig and Johnson provided a commercially viable answer to the problem of producing attractive bows rapidly, easily, uniformly, and with reduced manual operations. The hand-powered S–70 and S–71 models introduced by 3M in 1958 found successful application in department stores and other business establishments. The success of these hand machines stimulated a demand for fast automated equipment. [Johnson, Vol. VI, pp. 23, 25–28, 100–107, 124–127; Taylor, Vol. VI, pp. 134–138; Nimmo, Vol. VII, pp. 4–12, 16–18, 35–37; Doherty, Vol. XIII, pp. 24–25; PX 13.]

27. In an application filed in the U. S. Patent Office on October 28, 1950 by 3M it was noted that:

"In recent years the 'gift-wrapping' of packages has become a highly commercialized business. Various manufacturers have placed many new and attractive wrapping papers, decorative ribbons and the like on the market, and the various women's magazines very frequently feature articles promoting these materials and new techniques for their use. One of the basic techniques which has been promoted, and which is now used on almost all fancily wrapped packages, is the ornamental pompon bow, fashioned from many loops of decorative ribbon to resemble a tufted ball."

This general statement was reaffirmed in an application filed in the Patent Office on July 19, 1955. [Pltf's Exh. 3 Tab 18, 30, T Vol. VI 7/8/74 pp. 51–52, Johnson.]

28. Facile Corporation, which in about 1960 was acquired by Sun Chemical Company, was influential in promoting expansion of the decorative bow manufacturing industry through the development of faster automated equipment. [Nimmo, Vol. VII.]

29. Facile's entrance into the bow making industry came in 1958 as a result of a business relationship between Facile and David Henderson. Henderson had contracted with a customer to supply it with star bows made on Henderson machines, and Facile had contracted to furnish Henderson with the necessary ribbon. When Henderson was unable to make the bows on his equipment with the Facile ribbon, he returned the ribbon to Facile which, in order to reduce or avoid its losses, then undertook to fill

the customer's order for bows. Thereafter, Facile continued to contract directly with the customer for the manufacture and sale of star bows. [Nimmo, Vol. VII, pp. 23–27; 101–102.]

30. Philip E. Nimmo, currently manager of machine design and development for the artistic Division of Sun Chemical Company (hereinafter referred to as Sun Chemical) was initially employed by the Facile Corporation (hereinafter referred to as Facile). In 1959, Mr. Nimmo who was then also engaged in machine design and development was given the job of designing an automatic bow machine because Facile decided to go into business of producing star bows on automated bow machines at that time. [T Vol. VII 7/9/74, pp. 4–5, Nimmo.]

31. Sometime in 1958 Eugene Jacobson, the proprietor of Facile, showed Nimmo how to make star bows by hand simply using "a pencil and a strip of ribbon with holes punched into it." Jacobson formed the bow by holding the pencil vertically, slipping the portion of the ribbon with the hole in it over one end of the pencil, then turning the pencil and forming the next loop of the bow by placing another portion of the ribbon over the end of the pencil. When Jacobson got to a certain point in the formation of the loops of the bow, he put a string type clip on it, and he said 'This is what we want to form' ". The procedure was substantially the same as that followed by Wanchek. [T Vol. VII 7/9/74, pp. 30–32, Nimmo.]

32. Although Jacobson formed a bow on a pencil, the same type of bow could have been formed utilizing one or more needles, a brass fastener (as in the Wanchek bow) or a "collar button" or staple. [T Vol. VIII 7/10/74, pp. 104–105, Benner].

33. The first time that Facile undertook to make star bows was in late 1958 on the "hand jig", the parts of which were made by Augsburger Tool & Die in accordance with instructions given by Nimmo to Charles Augsburger, the owner of that company. Nimmo designed the mechanism and submitted sketches to Augsburger. [T Vol. VII 7/9/74, pp. 23–26, Nimmo, Def's Exh. 126.]

34. The hand jig designed by Nimmo simulated the hand movements by Jacobson in fashioning the star bow on a pencil. On July 25, 1958 Nimmo, Facile's employee, wrote to Facile Corporation:

"We are setting forth in detail a drawing, to scale, showing the bow machine as constructed. In addition, we are describing each part as clearly as possible. This piece was designed by the writer, in accordance with directions received from the president, Mr. Eugene Jacobson, and was conceived from an original idea. At our request, it was constructed by Augsburger Tool & Die Company, 51 East 11th Street, Paterson, New Jersey, who assembled this unit in accordance with our direction and contributed nothing in the way of original thought." [T Vol. VII 7/9/74, pp. 31–33 Nimmo Pltf's Exh. 12(b).]

35. The star bow made by Facile on the Nimmo "hand jig" was very similar to the star bow produced by Berwick. [T Vol. VII 7/9/74, pp. 28–34, Def's Exh. 15(b); Pltf's Exh. 4, Nimmo.]

36. Nimmo designed for use by Facile in producing star bows on the "hand jig" a rotary punching machine to prepunch ribbon as a desirable preparatory procedure in fashioning the star bow. Pre-punching the ribbon was not essential to the formation of star bows on the "hand jig" and the star bow could have been formed without pre-punching the ribbon. [T Vol. VII 7/9/74, pp. 45–46, Nimmo.]

37. During the time that Facile produced bows on the "hand jig" Nimmo had not envisioned any way to eliminate the pre-punching of the ribbon. The technique of forming bows without pre-punching ribbon was developed in connection with the manufacture of the

Augsburger semi-automatic machines, approximately 6 months after Nimmo viewed one of the early 3M machines. [T Vol. VII, 7/9/74, pp. 35–50, Nimmo.]

38. The "hand jig" designed by Nimmo utilized as the central ribbon holding means during bow formation a retractable needle or spindle in place of the pencil originally used by Jacobson in his initial talk with Nimmo. The mechanism was a joint concept of both Nimmo and Jacobson. [T Vol. VII 7/9/74, p. 31, Nimmo.]

39. Augsburger manufactured for Facile approximately 300 of the "hand jigs" designed by Nimmo to make star bows from pre-punched ribbon which were very similar to the star bows produced by Berwick. [T Vol. VII 7/9/74, pp. 26, 30; Pltf's Exh. 15(b), Nimmo.]

40. During 1958 approximately six to seven million star bows were produced by Facile on the "hand jig." Because the marketing of the star bows appeared to be worthwhile to Facile, Nimmo was asked by Jacobson to proceed with the development of a large output semi-automatic bow machine. Nimmo then devoted six to eight months from the latter part of 1958 to early 1959 designing a semi-automatic star bow producing machine. The parts for the semi-automatic machine were purchased from Augsburger. [T Vol. VII 7/9/74, pp. 5–10, 35, 63–64, Nimmo.]

41. During the time that Nimmo was in the process of designing the semi-automatic star bow making machine he observed one of 3M's S–70 or S–71 hand crank devices and because of the presence of the collar button ribbon impaling pin and manual operation necessary in connection with the placement of said pin in the chuck of the machine the 3M apparatus did not afford Nimmo any practical instruction as to the production of an automatic star bow machine. The concept embodied by the "hand jig" with a retractable needle or spindle was a better approach to the production of a star bow on a semi-automatic machine

than the method utilized by the 3M machine. [T Vol. VII, 7/9/74, pp. 36–39, Nimmo.]

42. By 1959 and 1960 Facile was employing approximately 20 semi-automatic star bow making machines producing approximately twenty six million bows a year. Facile pursued a continuous policy of changing, updating, and improving its bow making activities. [T Vol. VII 7/9/74, pp. 43–44, 50, 57, Nimmo.]

43. The details of the "hand jig" operation were described by Nimmo as follows: a base plate of steel is bored out and has two bearings placed in it. A rotating spindle drops down in the center of the bearings and rotates freely on the bearings. The spindle consists of a bored out $\frac{1}{4}$" pin. A small spring pushes upwards on it. The pin is nose-pointed at the top to impale the ribbon. Mounted on the steel base is a heavy duty desk stapler. The jig operator takes the pre-punched ribbon and places ". . . the hole over the pin, pressing it down, turns the spindle forming the loop, and . . ." places the next segment of ribbon on the pin. This operation is repeated until the bow is formed. The ribbon is then cut with scissors, a card is laid on top of the bow for fastening to the package, and the ". . . stapler is lowered onto the surface of the ribbon pressing the ribbon down to the top of the spindle, forcing its retraction and subsequently driving a staple through the ribbon." The completed bow is then removed. In its first undertaking to manufacture star bows in late 1958, Facile relied on hand formation and utilized ribbon which had been pre-punched with spaced holes. Rotary punching machines were developed to perforate the ribbon, and 300 jigs were built to assist in the hand formation of the loops. [Nimmo, Vol. VII, pp. 23–30, 34, 45; DX 126.]

44. The first Facile semi-automatic star bow machine although motor driven required the presence of an operator to attend to each machine. Bows were

formed on vertically aligned needles mounted in a spindle. In the formation of each loop, ribbon was withdrawn from a supply roll by a reciprocating shuttle. As the shuttle carrying the ribbon moved forward, it climbed a cam until the portion of ribbon supported in the ribbon guide was positioned above the retaining needles. Application of the ribbon portion to the retaining needles occurred when the shuttle dropped off of the cam. The downward movement of the shuttle brought a portion of the ribbon onto the needles so that the ribbon was impaled by the needles. The needles were rotated with the impaled ribbon thereby imparting a twist to the ribbon and forming the resultant loops of the bow. The finished bows were stapled in the center. The mechanism described above fits into the category of a "cam drop-off" machine. [Nimmo, Vol. VII, pp. 6–8, 36.]

45. The semi-automatic cam drop-off type machine which Facile developed in the first seven months of 1959 was built from parts ordered from Augsburger Tool & Die which was situated next door to Facile's plant in Paterson, New Jersey. Twenty of these machines were built and used by Facile in the production of star bows for the next several years. Facile severed business relations with Augsburger in the 1959–1960 period and, thereafter, Augsburger continued to make and sell bow machines to other concerns. [Nimmo, Vol. VII, pp. 8, 39, 41–44, 47–48, 52–54, 56, 99–100.]

46. By the end of 1959, Facile had determined that faster, more automated machines were needed to meet the demands of the expanding bow industry. In 1960 and 1961, Facile (which in 1960 was acquired by Sun Chemical Company) successfully developed a fully automatic cam drop-off type machine. By late 1961, the original semi-automatic machines had been converted to the fully automatic mode of operation and Sun had in operation the 20 converted semi-automatic machines plus several newly manufactured automatic can drop-off

machines. Although these improved machines functioned to form bows in essentially the same way as the original semi-automatic machines, they were much faster and required only one operator to run a bank of machines. These automatic cam drop-off machines are still in use at Sun Chemical. [Nimmo, Vol. VII, pp. 9–11, 51–54, 57.]

47. Sun also sold some of its cam drop-off bow machines to others in the industry. The Tye-Sil company in Canada purchased a semi-automatic machine from Sun, but because of dissatisfaction with price decided to build their own machines. The resulting Tye-Sil machine was essentially a duplicate of the cam drop-off machine originally constructed by Facile. [Nimmo, Vol. VII, pp. 98–99.]

48. The "cam drop-off" machines (whether described by Henderson in his patent application, or developed by Facile and Sun or copied from Sun by Tye-Sil) utilize the same mechanical means for placing successive segments of ribbon onto the retaining needles. In each such device, ribbon is withdrawn from a supply roll and advanced to a point over the needles by the reciprocation of the shuttle which holds the ribbon, and the ribbon is then applied to the needles by the downward motion of the shuttle as it drops off a cam. [Nimmo, Vol. VII, pp. 7–8, 10–11; DeMoor, Vol. VII, pp. 115–119, 124–126, 136; PX 5b, 26d.]

49. Sun Chemical Company was instrumental in the entry of Ragen Precision Instruments into the bow machine business. In 1962, Sun engaged Ragen, which had modern machine shop facilities, to work with Sun in the development of higher speed bow machines of Ragen's design. Working with Mr. Nimmo, Mr. Ira Lopata, President of Ragen, was given access to the latest developments at Sun. As a result, a succession of star bow machines evolved at Ragen. [Nimmo, Vol. VII, pp. 12–16, 58–62; Lopata, Vol. XII, pp. 117–118.]

50. The first bow machine produced by Ragen as a result of its cooperative effort with Sun was known as the "Mark I." This was followed by the "Mark II", and finally by the "Mark III", also known as the "Bowmatic" (Models 350 and 350A). [Nimmo, Vol. VII, pp. 13–15.]

51. The Ragen Mark I was a cam drop-off machine similar to those previously developed at Sun and shown to Lopata in 1962. The Mark I machine was noisy, lacked the speed desired by Sun, and was unacceptable in several design details. It never went into production at Sun and was returned to Ragen for redesign. [Nimmo, Vol. VII, pp. 13–14, 58–62, 64.]

52. The Ragen Mark II resulted from a modification of the Mark I. In the Mark II model the shuttle did not rise on a cam but moved straight forward. Also, in the Mark II, instead of bringing the ribbon to the retaining needles by the downward movement of the shuttle, as it dropped off the cam, the spindle containing the pins was raised to impale the portion of ribbon brought forward by the shuttle, the spindle twisting between each cycle to form the bows. The cam that in the Mark I caused the shuttle to rise up into position over the impaling pins was replaced in the Mark II by a different cam that raised and lowered the needle spindle. The Mark II's had a lower production rate than desired by Sun. [Nimmo, Vol. VII, pp. 13–14, 64–66; Benner, Vol. VII, pp. 191–196; PX 26d, 27a.]

53. The final step in the evolution of Ragen machines was the Bowmatic. Like the previous Mark II, produced by Ragen, the retaining needles in the Bowmatic move upwards to impale the ribbon. As in the Mark II, the Bowmatic utilizes a cam to raise and lower the spindle for repeated impalements of portions of ribbon. The Bowmatic utilizes as a feed means a rubber drive roller and an idler or pressure roller which formed a nip through which the ribbon was threaded instead of employing a reciprocating shuttle to perform the ribbon withdrawal function. In the Bowmatic, when the pressure between the two rollers is properly adjusted, frictional contact with the ribbon serves to withdraw it from the supply and advance it to a point over the needles where portions are successively impaled by the raising of the needles on the spindle. The Bowmatic is highly sophisticated and utilizes advanced solid state electronic circuitry to control its operation and its production rate is substantially faster than that of the previous machines. Fourteen of the Bowmatics have been acquired and are being used at Sun. [Nimmo, Vol. VII, pp. 14–16, 67–69, 79–82; Benner, Vol. VIII, pp. 3–13; PX 16a, 26e; Lopata, Defendant's Ex. 121.]

54. The Bowmatic was developed by Lopata, in response to Facile's request that he design "a reliable piece of equipment with low maintenance that would produce a quality product, and that could be easily varied as to size and number of loops, with or without a center loop, which would represent a vast improvement at the time over the methods that they were using", and further that the equipment be designed to handle at high speeds the polypropylene ribbon which was then the desired material for use in bow making. [T Vol. VIII 7/10/74, p. 13, Benner; Vol. XII pp. 82, 119, Lopata; Def's Exh. 121.]

55. The Bowmatic is the subject of patent No. 3,415,429 issued by the U.S. Patent Office on December 10, 1968 to Ira Lopata pursuant to an application filed January 5, 1967. [Pltf's Exh. 5 Tab 11 [Bowmatic].]

56. Berwick, in the manufacture of star bows on the Bowmatic, has used polypropylene ribbon, "Sasheen" ribbon, and satinette ribbon. Berwick has not observed any difference in the way the Bowmatic forms a bow depending upon which of these types of ribbon stock is being used, and Berwick's operation of

the Bowmatic is the same without regard to the type of ribbon. "Sasheen" is a 3M product. [Marsicano, Vol. XVIII, pp. 3–4.]

57. Sun purchased from Ragen approximately 20 to 21 automatic bow making machines designated Mark II which had a production capacity of approximately 5,000 bows per shift; three Mark III Bowmatic Model 350s and 11 Ragen Mark III Bowmatic Model 350–A's, each Bowmatic having a capacity of producing approximately 14,000 bows per shift. Generally Sun operated the equipment for two 8-hour shifts and on occasion operated 3 shifts. The aggregate capacity of Sun on the Ragen equipment was approximately 148,000,000 star bows per year. Sun also employed a substantial number of star bow producing machines of the Nimmo design. [T Vol. VII 7/9/74, pp. 66–69, Nimmo.]

58. Sun is currently using the automated cam drop-off machine and the Ragen Mark II and Bowmatic machines. The star bows made on these machines are identical and are commingled by Sun and marketed under license from 3M under the '223 and '240 patents in suit. Bow packages marketed by Sun containing such bows have marked on them that the star bows are made under license of the '223 and '240 patents. [Nimmo, Vol. VII, pp. 16–21; PX 33.]

59. The S–71 with an operator working at a 100% performance level over an eight hour shift could achieve the following average production rates:

15 loop star bows—170 bows per hour

25 loop star bows—120 bows per hour.

Thus, the S–71 has a capacity of approximately 2,500 to 4,000 bow loops per hour. The Bowmatic had a capacity of 350 loops per minute or 21,000 loops per hour. The cam dropoff has a capacity of approximately 2,000 to 3,000 bows per shift. [Statement of Uncontested Facts B–2 T Vol. XII 7/9/74 pp. 43, 68 Nimmo.]

60. Speed was one of the most important objectives in the production of decorative bows. A 3M time study disclosed that the manual operation to "get and insert a pin" required about 25% of the total time involved in formation of the bow. [T Vol. XIV 7/19/74 p. 7, Kravig; Vol. XVI 7/23/74 pp. 81–82; Def's Exh. 108.]

61. Once the feed mechanism is activated in the Bowmatic, the ribbon will be continuously urged forward and in the absence of impaling needles would run off the end of the machine onto the floor. The impaling spindle is involved solely in bow formation and has nothing whatever to do with the withdrawal of ribbon from the supply roll. [T Vol. XV 7/22/74 p. 5, Schaffer; Vol. IX 7/11/74 pp. 57–62, Benner; Vol. XIV 7/19/74 p. 39, Shaffer.]

62. In the Ragen Mark II and Bowmatic machine, withdrawal of the ribbon is achieved through the generally horizontal movement of the ribbon as it is advanced through the ribbon guide and application is achieved by the vertical reciprocation of the needle shaft. [Benner, Vol. VII, pp. 194–198; Benner, Vol. VIII, pp. 6–11; Benner, Vol. IX, p. 83; Benner, Vol. X, pp. 6–7; Howson, Vol. X, pp. 89–91, 94–99; Shaffer, Vol. XIV, pp. 52–53.]

63. It makes no difference to the resulting bow whether the ribbon portion is moved to the needles, or the needles to the ribbon. In either case, ribbon which has been withdrawn from the supply roll is affixed to the retaining means, the retaining means rotates to introduce a twist in the bight of the loop being formed and a successive application of ribbon on the retaining means closes the loop. [Benner, Vol. VII, pp. 194–197; Benner, Vol. VIII, pp. 5–11; Howson, Vol. X, pp. 101, 106–107; Howson, Vol. XVIII, pp. 30–31.]

64. In the cam drop-off machines, a cam intermittently raises and drops the shuttle and ribbon guide, whereas in the Mark II and Bowmatic, a cam intermit-

tently raises and drops the needle shaft. [Benner, Vol. VII, pp. 195–196; Benner, Vol. VIII, p. 11; Shaffer, Vol. XV, p. 85; Howson, Vol. XVIII, pp. 23–24.]

65. In the Bowmatic, "successive portions of ribbon spaced along the continuous length thereof" are engaged on the needles and retained thereupon and the spindle is rotated "to twist the length of ribbon after each impaled portion into a loop prior to the next impalement." [Lopata U. S. Patent No. 3,415,429 (PX 4, Tab 11), Col. 7–8, claim 8.]

66. The mechanism in the Bowmatic consisting of the continuously rotating drive wheel with an idler wheel positioned directly above is designated in recognized mechanical classification as a roller drive as distinguished from the four bar mechanism employed in the S–71 and S–72 3M bow making devices. [T Vol. XIV 7/19/74 pp. 39–40, Shaffer.]

67. The motion of the shuttle and carriage on the cam drop off machine is defined in basic mechanical terms as a slider crank mechanism. The slider crank mechanism is a recognized mechanical classification distinguishable from the four bar mechanism. [T Vol. XIV 7/19/74 pp. 36–38, Vol. XVI 7/23/74 pp. 57–58, Shaffer; Vol. XVIII 7/25/74 p. 59, Benner.]

68. The Tye-Sil and Wanchek bow machines utilized by Berwick are essentially identical in structure and operation, and for purposes of this suit may be regarded as the same apparatus. These machines are of the cam drop-off type. [Uncontested Fact No. 11; De-Moor, Vol. VII, p. 136; PX 26c.]

69. In the pom-pon bows made by Berwick on the Camberloc machines, the machine automatically excises semi-circular portions of the ribbon on opposing sides thereof along the outer edges of the ribbon at spaced points along the length of ribbon prior to bow formation. These cut-outs facilitate the formation of creases in the ribbon adjacent the central holding means of the bow and reduce the mass of ribbon which would otherwise be concentrated at the point of intersection. [Howson, Vol. X, pp. 112–113; Shaffer, Vol. XV, pp. 88–89; PX 14b.]

70. The needles on the Camberloc in contrast to the other automatic equiment here involved are mounted horizontally. The ribbon on the Camberloc is fed across a table. At the front of the table or carriage is a ribbon guide through which the ribbon is fed through a vertically positioned guide so as to be in position for impalement on the horizontally pointed needles. The carriage is moved over the cams until the ribbon is brought in contact with the barbed needles, is impaled on the needles and then is withdrawn. The needles thereafter rotate the appropriate number of degrees to form a pom-pon bow. The motion of the carriage of the Camberloc is defined in mechanical terms as a slider crank mechanism. [T Vol. XIII 7/10/74, pp. 35–37, Benner; Vol. XV 7/22/74, pp. 88–90, Shaffer; Vol. VIII pp. 33–35, Benner; Vol. XVI 7/23/74, p. 59 Shaffer.]

71. Since February 23, 1967, Berwick has utilized Tye-Sil and Ragen Bowmatic machines in its Berwick, Pennsylvania, plant to make star bows. During the same period, Berwick has employed Camberloc machines to make pom-pon bows. Since about 1970, when Berwick opened its West Coast plant, Berwick has utilized Tye-Sil and Wanchek machines to make star bows in that plant. [Uncontested Fact No. 11; PX 14b, 15b.]

72. Claims 1, 2, 5, and 17 of the '223 patent describe the bow producing apparatus. These four claims set forth in slightly varying degrees the structural concept which Kravig and Johnson regarded as their invention. Claim 5 is the most detailed. It includes all of the elements found in claims 1, 2, and 17. Consequently, claim 5 has been treated as representative of all of the apparatus

claims in suit on the issue of infringement. [Benner, Vol. VII, pp. 144, 147–149; PX 35.]

73. Claim # 5 of the '223 patent provides as follows: "[Claimed is] a machine for making decorative bows from a continuous length of ribbon comprising a shaft for receiving and rotatably supporting a supply roll of ribbon, rotatable loop retaining means and ribbon feed means, said retaining means being adapted to retain in fixed position relative thereto ribbon applied there against; said feed means operating to withdraw a continuous length of ribbon from a supply roll mounted on said shaft and successively to apply portions of ribbon spaced along said continuous length against said retaining means successively to form radiating loops of ribbon, said retaining means being caused to rotate between each application of a ribbon portion thereto, said loops thereby being twisted as they are formed and being disposed on different radii." [Plaintiff's exhibit # 4.]

74. The essential elements of Claim 5 set forth in the preceding paragraph are (1) a shaft for supporting a supply roll of ribbon, (2) a rotatable loop retaining means, and (3) a ribbon feed means. In essence, the feed means performs two functions: First, it withdraws ribbon from the supply roll to a position within the mechanism; and secondly, it successively applies a portion of ribbon to the retaining means. The rotatable loop retaining means twists between each successive application of a portion of ribbon applied thereto, holding it in a fixed position relative to the rotatable retaining means, thus twisting the ribbon applied thereagainst to form each loop of the bow. [Plaintiff's Exhibit 4.]

75. 3M's S–71 bow machine which is described in the '223 patent operates in the following fashion: ribbon held by the ribbon gripper is withdrawn from a supply roll by the forward movement of the shuttle located on a pendulum arm. As the shuttle reaches its forward-most

position, a portion of the ribbon is applied to a removable plastic pin held in a rotatable chuck. The pin holds the impaled ribbon portion in fixed position with respect to the pin so that during the time when the shuttle feed means is withdrawing the next length of ribbon, rotation of the spindle and pin introduces a twist in the ribbon between the pin and the ribbon guide. Successive applications of spaced ribbon portions to the pin with the intermittent rotation of the spindle and pin result in formation of the desired twisted loops disposed on different radii from the center of the bow. [Johnson, Vol. VI, p. 19; Benner, Vol. VII, pp. 158, 161–165; Benner, Vol. VIII, pp. 58–61; PX 1a, 26a, 29a, 29b.]

76. The plastic pin held by the chuck is shaped somewhat like a collar button having a pointed end at the front of an enlarged conical tip and a shank attached to a back plate or base end. The machine operator manually presses a handle at the end of an ejector rod which when pushed forward causes the opening of gripper jaws in the front of the assembly on which the device is mounted so that the base of the plastic collar button type pin can be manually inserted within the jaws of the chuck. The handle is then pulled backward so that the jaws of the chuck forceably grasp the base of the collar button type pin and hold it firmly in position. [Pltf's Exh. 1(a), Figs. 3 and 6, Col. 5, lines 3–7; Col. 7, lines 40–68; Col. 8, lines 22 and 29; T Vol. VI 7/8/74 pp. 91–94, Johnson; Vol. XIV 7/19/74, pp. 46–47, Shaffer.]

77. The chuck which grasps the collar button pin is a commonly used mechanical apparatus. [T Vol. 7/8/74 pp. 94–95, Johnson.]

78. Positioned at the front of the assembly upon which the plastic collar button type pin is affixed is a horizontally slideable annular sleeve. The front portion of the annular sleeve in the S–70 was made of a metallic material which

was modified in the S–71 and S–72 to a rubber material with a serrated front. The purpose of the change to rubber was to increase friction, thus making certain that there was no relative motion between the ribbon and the machine components, namely, the serrated front of the sleeve and the rear portion of the conical head of the plastic pin during rotation of the assembly. [Pltf's Exh. 1(a); T Vol. XIV 7/19/74 p. 50, Shaffer.]

79. To form a bow on the S–70, S–71 or S–72 with or without power pack following the manual insertion and grasping of the plastic pin as described in Finding # 76 ribbon is manually fed through a ribbon guide. As it is fed through the guide, it is slipped under a leaf spring and passed through a curved aperture. The end of the ribbon is then pulled through the opening so that it extends downward over the end of the shuttle. When the ribbon is thus positioned the pendulum in the S–70, the hand crank in the S–71 or S–72 or the power pack motorized substitution for the hand crank is actuated forcing the pendulum on which the shuttle is mounted to move forward and forceably contact the front of the rubberized serrated sleeve pushing the sleeve backward and forcing the ribbon over the tip and onto the shank of the plastic collar button. The motion then continues with the pendulum and shuttle withdrawing so that the rubberized sleeve then returns to its forward position and the ribbon is grasped by the front of the serrated edge of the rubber tipped sleeve and the rear of the conical tip of the plastic collar button pin. As the pendulum moves backward from the impaling station the ribbon is held firmly as aforesaid and the leaf spring slips along the length of the ribbon. When the motion of the pendulum and shuttle begins to move forward again, the leaf spring having no further backward pull takes with it another length of ribbon and the impaling process is repeated. During the interval when the shuttle is not in contact with the plastic collar button pin and sleeve, the assembly in which the pin is located rotates so that when a new length of ribbon is affixed to the pin the loop of ribbon is positioned in a different location. This is the twist automatically imparted to the ribbon which is unidirectional in that the rotation of the pin holding assembly is in one direction. After the desired number of loops are formed, the operator stops the motion of the pendulum and shuttle. On the machines with the power pack the number of times the pendulum will swing is predetermined and the machine will stop after the desired number of loops are formed. In all of the machines the operator must cut the ribbon with a scissors and then press the handle at the rear of the ejector rod to open the gripper jaws and release the finished bow which is held together in final assembly by the plastic collar button. [Pltf's Exh. 1(a), Cols. 14 and 15.]

80. The conical section of the collar button type pin has a diameter larger than the shank of the pin so that the ribbon will not be pulled off the pin and so that by reason of the interaction between the rear portion of the conical tip and the front of the serrated rubberized sleeve a force is developed between the sleeve, the ribbon and the pin holding device keeping everything firmly affixed and there is no relative motion as the retainer assembly in which the pin is located rotates. [T Vol. XIV 7/19/74 pp. 47–49, Shaffer.]

81. The collar button type pin remains part of the completed bow and is utilized to affix the bow to the package intended to be decorated, "much like pressing a thumb tack into place." The point of the plastic collar button type pin pierces the package wrapper and once on the inside the large conical head retains the bow in place. [Defendant's Exh. 56; T Vol. XIV 7/19/74 pp. 20–22, Johnson; Pltf's Exhibit 1(b), Col. 6, lines 10–16; Statement of Uncontested Facts, Def's numbers B 3, 4, 5.]

82. The collar button pin was, on occasion, undesirable because the front portion of the pin which penetrated the package damaged the contents of the package if it contained whiskey bottles, nylon stockings or objects of other fine fabric. To remedy this problem 3M devised the procedure of manually smashing and breaking the pointed end of the pin after the bow was formed and then manually affixing a staple to hold the bow together. Breaking the pin apart was inefficient, required additional manual effort and extended the time within which to fashion a bow. The problem caused by the pin on the "S" series machines does not exist with respect to any of the bows produced on the accused machines. [T Vol. XIV 7/19/74 pp. 19–24, Johnson; Statement of Uncontested Facts, Def's numbers B 6–8.]

83. The S–70, S–71 and S–72 3M bow making machines were all marketed by 3M with sales running into thousands of units for use in retail establishments and in production of commercial gift wrapping. The S–72 is presently being marketed by 3M at a unit price of approximately $100. From 1965 to 1971 3M sold approximately 29,447 S–72 bow making machines with a capacity of producing approximately 70 million star bows per year.

Many of the 3M "S" series machines are still in use. Some retail outlets prefer to use the original Kravig and Johnson designed machines rather than purchase the pre-formed bows produced on the more advanced machines. [T Vol. VI 7/8/74 pp. 26, 115–121, Johnson; Def's Exh. 105; T Vol. VI 7/8/74 pp. 133, 137–139, 146–147, Taylor, Vol. XIV 7/19/74 p. 4, King.]

84. The particular way in which the components of the 3M S–71 and S–72 bow making machines operates is defined in mechanical terms as a four bar mechanism. The four bar mechanism is a basic mechanism well known to mechanical engineers. [T Vol. XIV 7/19/74 pp. 32–36, Vol. XVI 7/23/74 pp. 55–57, Shaffer; Vol. XVIII 7/25/74 p. 59, Benner.]

85. No ribbon is or can be withdrawn from the supply roll in the 3M S–70, S–71 and S–72 machines unless and until the ribbon is impaled on the plastic collar button type pin and is held in fixed position by the interaction of the enlarged conical tip and the rubberized serrated front portion of the sleeve. One end of the ribbon must be firmly held so that the pendulum can move away from said end of the ribbon towards the supply roll leaving a portion of ribbon between the pin and the pendulum. [T Vol. XV 7/22/74 pp. 66–67, Vol. XVI 7/23/74 pp. 44–45, 51–54, Shaffer.]

86. The S–70, S–71 and S–72 3M bow making machines cannot produce a star bow in which there is a center loop to cover the collar button pin. A center loop on the 3M bow making machines must be made manually. The accused devices are designed so that a star bow with a center loop is automatically formed. [Statement of Uncontested Facts Def's numbers B 25 and 26; T. Vol. XV 7/22/74 pp. 43–44, 47, Shaffer.]

87. The 3M S–70, S–71 and S–72 devices employ the plastic collar button type pin as a machine element on which the bow is formed and which thereafter serves the dual function of holding the loops of the bow together and of affixing the completed bow to the package upon which the bow is to be employed as a decorative feature. None of the accused machines employ a device which serves the dual function of acting as a machine element during bow formation and then remaining a part of the finished product. [Statement of Uncontested Facts Def's number B 22.]

88. On the S–70, S–71 and S–72 3M bow making machines the ribbon is retained on the rotatable assembly by the direct holding force of the enlarged head of the conical tip and the pressure exerted by the slideably mounted rubberized

serrated edge of the sleeve. The ribbon on the accused devices is retained on the needles employed in said machines by frictional force. The retaining force insofar as the 3M machines are concerned is thus a direct force applied perpendicular to the plane of the ribbon whereas on the machines employing retractable needles there is no direct force but merely a frictional force applied parallel to the needles and at right angle to the plane of the ribbon. [T Vol. XIV 7/19/74 pp. 57–61, Shaffer; Vol. VIII 7/10/74 pp. 95–98, Benner.]

89. In the S–73 machine, 3M's unsuccessful attempt at an automated bow-making machine, ribbon is withdrawn from a supply roll by a pivoted shuttle acting in conjunction with a one-way ribbon gripper and guide. The shuttle moves forward grasping the ribbon until the part of the ribbon to be impaled is positioned above a spindle on which are mounted three vertically aligned needles. Impalement is effected when a cam controlled air cylinder pivots the forward end of the shuttle downward, carrying the ribbon onto the points of the needles. The ribbon is supported on the shuttle in a ribbon guide having a U-shaped notch at its forward end to facilitate the ribbon's impalement on the needles which at the time of impalement protrude upwardly through such notch. The shuttle then retreats with the ribbon gripper sliding along a length of ribbon. At the beginning of a new cycle the ribbon gripper engages the ribbon and the shuttle again moves forward. As the shuttle approaches its forward-most position for the second time, the spindle carrying the needles rotates, thereby imparting the desired twist to the ribbon between the points supported at the one end by the needles and at the other end by the ribbon guide. A second impalement through the ribbon completes the loop. [Johnson, Vol. VI, pp. 27–29; Benner, Vol. VII, pp. 168, 171–177; PX 12b, 26b.]

90. Kinematic inversion represents the change of functions of machine components of a specific mechanism while the relative motion between points in a mechanism remains the same. An example would be the ordinary desk stapler. The same function is performed by the stapler whether it is supported at its base and the top is brought down or whether the stapler is supported at the top piece and the base is advanced upward. Using this definition the Bowmatic machine is not a true example of "kinematic inversion" with respect to the cam drop-off machine. [Shaffer, Vol. XIV pp. 41–42; Benner Vol. VII pp. 199–201.]

91. "Kinematic inversion" can also be demonstrated in the hand crank bow machine of the type specifically illustrated in the '223 patent. In the normal operation of an S–71 or S–72 machine, all parts of the mechanism, including the retaining means, remain stationary with respect to the linear movement of the shuttle arm with its ribbon gripper and ribbon guide components. By clamping the pendulum arm in a stationary position, and permitting freedom of movement in the remainder of the machine, an "inversion" is performed. When the hand crank is then turned, the retaining means moves to the stationary ribbon portion and impalement in the retaining means takes place. In either its normal or inverted configuration, the S–72 produces the same bow. [Benner, Vol. X, pp. 3–10; Shaffer, Vol. XIV, pp. 41–42; PX 18.]

92. The apparatus Claims 1, 2, 5 and 17 of the '223 patent require a machine providing "retaining means being adapted to retain in fixed position relative thereto ribbon applied thereagainst." The retaining means of the '223 patent contemplated a collar button type pin acting in combination with the rubberized serrated front portion of the retained ribbon during loop formation. The pin and sleeve serve to prevent the ribbon from falling off the collar button pin when the feed means withdraws from contact therewith. The pin by holding the ribbon on the retaining

means then enables the pendulum mounted shuttle to move backwards and to grasp another portion of ribbon for impalement on the pin. The collar button pin further serves as part of the machine retaining means on which the bow is fabricated. The pin upon removal becomes a permanent part of the bow with the continuing function of utilization as a means of affixing said bow to the package to be decorated. None of the accused devices provide for retaining means as described above. [Pltf's Exhs. 1(a), 1(b), pp. 73–74; T Vol. XIV 7/19/74 pp. 48–50, Vol. XV pp. 35–43, 95–97, Shaffer.]

93. The bow making equipment employed by Berwick does not contain a pendulum type swing arm which moves into contact in the fashion illustrated by the device of the '223 patent. [Pltf's Exh. 1(a).]

94. Automation and production capability dictated the constant need for design alternatives in producing high speed bow-making equipment. The 3M S–73 and the machines developed by Facile and Sun all employ permanent retaining needles which are intermittently rotated between applications of ribbon and utilize staples to hold the finished bow. [Benner, Vol. VII, pp. 171–177, 185–191; Benner, Vol. VIII, pp. 62–70; PX 12b, 12c, 26b, 26c, 28a, 28b.]

95. Each of the Tye-Sil, Wanchek, Bowmatic and Camberloc bow machines employed by Defendant utilizes three needles or pins to retain the loops of ribbon as they are being formed. In each, the needles or pins serve to retain the ribbon applied thereto rotatively therewith during bow formation. [DeMoor, Vol. VII, pp. 118–121; Benner, Vol. VII, pp. 185–188; Benner, Vol. VIII, pp. 20–21, 33–34; Howson, Vol. X, pp. 95–96; PX 14a, 16a, 26c, 26e, 26f, 28a.]

96. In each of the Tye-Sil, Wanchek, Bowmatic and Camberloc bow machines operated by Berwick ribbon is withdrawn from a supply roll mounted on a shaft, and predetermined lengths or portions of that ribbon, spaced along its continuous length, become successively impaled upon the retaining needles. [DeMoor, Vol. VII, pp. 119, 123–124; Benner, Vol. VII, pp. 186–188; Benner, Vol. VIII, pp. 7–8, 15–18, 20–22, 33–35; Howson, Vol. X pp. 94–96; Howson, Vol. XVIII, pp. 20–21, 23–24; PX 14a, 16a, 26c, 26e, 26f, 28a.]

97. In each of the Tye-Sil, Wanchek, Bowmatic and Camberloc bow machines, the spindle and the retaining needles rotate in one direction intermittently after each successive impalement of the ribbon by the needles to form radiating loops having a unidirectional twist so that the legs of the loops are in a face-to-back relationship and form a smooth arcuate bight in the ribbon. [DeMoor, Vol. VII, pp. 120, 122, 126; Benner, Vol. VIII, pp. 20–21, 33–35, 44–47; PX 14a, 16a, 26c, 26e, 26f, 28a.]

98. Each of the machines operated by Berwick has "a shaft for receiving and rotatably supporting a supply roll of ribbon," a "rotatable loop retaining means" and "ribbon feed means." In each of the machines the feed means "withdraws a continuous length of ribbon from a supply roll mounted on said shaft," and the rotatable loop retaining means is "adapted to retain in fixed position," so far as rotation is concerned, "ribbon applied thereagainst."

In the S–71 and S–72 machines, the cam drop-off machines and the Camberloc machine, the feed means "successively" applies "portions of the ribbon spaced along said continuous length against said retaining means successively to form radiating loops of ribbon." In the Bowmatic, the needles impale the ribbon at "successive portions down the continuous length of ribbon" and "successively . . . form [with rotation of the spindle] radiating loops" of ribbon. [Shaffer, Vol. XIV, pp. 33, 37, 39–40, 44, 45; Shaffer, Vol. XV, pp. 91–92, 96, 113–116, 142–143.]

99. While, as indicated in prior Findings the language of Claim 5 of the '223 patent is broad, the expert witness-

es for both sides to the litigation agreed that the construction, operation and functioning of the Bowmatic, Camberloc, and Cam drop-off machines in the formation of decorative star bows are materially different from the construction, operation and functioning of the S–71 3M bow making machine described in the specifications to the '223 patent.

While conceptually all the bow making machines have parts that perform similar functions, the degree of sophistication between the machines as they actually operate is vast. [T Vol. IX 7/11/74 pp. 32–33, Benner; Vol. XVI 7/23/74 pp. 62–63, Shaffer.]

100. The retractable needles and final staple of the production-type bow machines performs one of the same functions as the plastic pin utilized in the hand-operated machines such as the S–71. Both the staple and the pin hold the bow together but the staple does not provide a method of attaching the bow to a surface. [Benner, Vol. VII, pp. 171–172.]

101. Each of the accused Tye-Sil, Wanchek, and Camberloc machines impales a ribbon on a loop retainer, rotates the retainer to twist the ribbon within the loop being formed, impales the ribbon again to close the loop, and repeats the sequence to form a succession of loops along varying radii. The aforementioned machines achieve the same result as the S–71, i. e., star and pompon bows of the type described and claimed in the '240 patent of Kravig and Johnson. [DeMoor, Vol. VII, pp. 119–129; Benner, Vol. VII, pp. 185–190; Benner, Vol. VIII, pp. 19–22, 38–39, 44–47, 48–51, 58–61, 65–68, 71–73, 79–80; Benner, Vol. IX, pp. 83–85; Howson, Vol. X, pp. 81–88, 94–97, 101, 106–107; Howson, Vol. XVIII, pp. 20–21, 23–26, 30–32; PX 10b, 10c, 14a, 14b, 15b, 16a, 16b, 16c, 26a, 26c, 26e, 26f, 28a, 29a.]

102. Claims 14 and 15 of the '223 patent are directed to a method of forming star bows. [Benner, Vol. VIII, pp. 42–44; Howson, Vol. X, pp. 80–81.]

103. Inasmuch as claims 14 and 15 are directed specifically to a method of forming star bows wherein the legs of each loop are brought together in "uncreased" intersecting face-to-back relationship, these claims do not read upon the method of making pom-pon bows which is utilized by Berwick in its operation of the Camberloc machine. Since Camberloc-made pom-pon bows do crease the legs of each loop adjacent their point of intersection, 3M does not charge that Berwick's operation of the Camberloc machine results in infringement of the method claims 14 and 15. [Benner, Vol. VIII, pp. 35–37.]

104. Claims 14 and 15 each recite the steps necessary to form at least two complete loops in the fashioning of a decorative bow from a continuous strip of ribbon. The claims differ in specifying details of the method, i. e., claim 15 adds that the loops are of generally conoidal shape, and that the legs are impaled on a central holding pin. [Howson, Vol. X, pp. 83–84, 87–88.]

105. The steps recited in claims 14 and 15 are performed in the 3M hand-powered S–71 machine which is illustrated in the '223 patent. A strip of ribbon is grasped at its free end by impalement on the retaining pin and at a second spaced point by the ribbon guide. When the retaining means is rotated, a unidirectional twist is introduced between the points where the ribbon is confined, and this twist imparts a generally conical shape to the smoothly arcuate bight formed when the free end and the spaced point are brought together. The loop is closed by fastening the second leg thereof to the first leg at their point of intersection by a second impalement of the ribbon on the central holding pin. Repetition of these steps along the continuous length of ribbon forms the bow. [Benner, Vol. VII, pp. 162–165; Benner, Vol. VIII, pp. 48–49, 58–61; PX 29a, 29b.]

106. The steps recited in claims 14 and 15 are performed in the operation

of the cam drop-off type machines. The first of these cam drop-off machines, i. e., that described by Henderson in his patent application filed December 28, 1960, was determined by the Patent Office to operate within the scope of method claims 14 and 15 of the '223 patent. Similarly, the Tye-Sil and Wanchek machines of Berwick which incorporate the cam drop-off mechanism form a bow by the method described in those claims. [Benner, Vol. VIII, pp. 44–47, 50; Howson, Vol. X, pp. 43–44, 46–48, 81–84.]

107. The steps recited in claims 14 and 15 of the '223 patent are not performed in the operation of the Bowmatic machines. The ribbon is grasped at its free end by impalement on the retaining needles but it is not grasped at the spaced point by a ribbon guide although when the needles are unidirectionally rotated, a twist is confined between the needles and the guide. The ribbon in the ribbon guide either continues to move forward during impalement and rotation or at the least it pauses momentarily at the time of impalement of the ribbon by the needles. When the needle spindle of the Bowmatic rises to apply the needles to the ribbon, the two places on the ribbon are then brought together in uncreased intersecting face-to-back relationship to form a generally conically shaped loop with a smooth arcuate bight. The legs of the first loop are fastened together by the impalement of the second leg onto the central holding needles, and subsequent loops along the continuous length of ribbon are formed by a repetition of these steps. [Benner, Vol. VIII, pp. 15–22, 44–47, 50–51; Howson, Vol. X, pp. 84–85, 87.]

108. In all of the Tye-Sil, Wanchek and Bowmatic machines, bows are formed from a succession of loops generated by (1) impaling the ribbon on a loop retainer, (2) rotating the retainer to twist the ribbon within the loop being formed, (3) impaling the ribbon again to close the loop, and (4) repeating the above to form a plurality of loops along varying radii. [Benner, Vol. VII, pp. 186–188; Benner, Vol. III, pp. 15–22, 33–37, 44–47, 48–51; Howson, Vol. X, pp. 89–91, 94, 94–97, 101, 106–107; Howson, Vol. XVIII, pp. 30–32, PX 14a, 16a, 26a, 26c, 26e, 26f, 28a.]

109. On July 23, 1958, during the proceedings before the Patent Office leading to the issuance of the '223 patent, the Patent Office stated that: "Claim 4 and 20, as broadly as drawn, are rejected as unpatentable over Sperry of record. The part 67 of Sperry is rotatable as seen in Figure 2. This is considered to be a 'rotatable loop retaining means' as recited herein." The claims 4 and 20 referred to in these interim proceedings are now claims 1 and 17 of the '223 patent. [Plaintiff's Exh. 1(b), p. 72.]

110. On January 13, 1960 3M's patent counsel requested the Patent Office to reconsider the rejection of claims 4 and 20 (now claims 1 and 17 of the '223 patent) because it was urged that the rotatable loop retaining means in the Kravig and Johnson patent was ". . . adapted to retain (the ribbon) in *fixed* position relative thereto . . . ." and specifically directed the Patent Office's attention to the specifications set forth on pages 32 and 33 of the patent application which involved that portion of the S–71 bow making machine which performed the following function: "As the crank 111 is further rotated new loops are formed. Sleeve 66, by virtue of the action of spring 71, firmly retains the layers of ribbon impaled on the pin firmly, so that they do not slip as the spindle rotates during formation of subsequent loops." The above forced holding action is described by 3M's patent counsel as a novel, improved and inventive concept which earlier referenced patents "neither shows nor appreciates." The forced holding action above described is present in the S–70, S–71 and S–72 machines and does not occur in any of the accused machines

employed by Defendant. [Pltf's Exh. 1(b) pp. 32–33, 73–74; T Vol. XII July 17, 1974 pp. 16–17, 21–22, Howson.]

111. As schematically illustrated in the attached diagram, 3M's S–71 and S–72 bow making machines operate in essentially the same manner. These machines have a shuttle (including a one-way ribbon gripper and a ribbon guide) at the end of a pivoted lever. Ribbon held by the ribbon gripper is withdrawn from a supply roll by the forward movement of the shuttle (Frame 2). As the shuttle reaches its forward-most position, a portion of the ribbon adjacent the ribbon guide is impaled on a removable plastic pin held in a horizontal spindle (Frame 3). The pin and spindle retain the impaled ribbon in fixed position with respect thereto for rotation therewith. The shuttle then moves rearward, ribbon slips through the one-way ribbon gripper, and the spindle and pin rotate and introduce a twist in the ribbon between the pin and the ribbon guide (Frame 4). On the next forward stroke of the shuttle, the shuttle withdraws the next length of ribbon from the supply roll (Frame 5) and a second portion of ribbon is applied to the pin to close the first loop of the bow (Frame 6). Successive applications of spaced ribbon portions to the pin, with the intermittent rotation of the spindle and pin (repetition of Frames 4 through 6), result in formation of the desired twisted loops disposed on different radii from the center of the bow. [Benner, Vol. VII, pp. 161–165; PX 4, Tab 1; PX 10a, 10b, 10c, 26c, 29a.]

EXHIBIT 26(a)

3M S-71 AND S-72

| 1 | 2 | 3 |
| START | WITHDRAW | APPLY |

| 4 | 5 | 6 |
| RETAIN AND ROTATE | WITHDRAW | RE-APPLY |

112. 3M's S–73 bow making machine, as schematically illustrated in the attached diagram, has a shuttle (including a one-way ribbon gripper and a ribbon guide) supported at the end of a pivoted arm. Ribbon held by the ribbon gripper is withdrawn from a supply roll by the forward movement of the shuttle (Frame 2). The shuttle is carried forward with the ribbon until the portion of ribbon supported in a U-shaped notch at the end of the ribbon guide is positioned above a vertical spindle on which is mounted three needles (Frame 2). An air cylinder pivots the shuttle arm to carry the shuttle vertically downward to impale the ribbon in the U-shaped notch on the needles (Frame 3). The needles retain the impaled ribbon in fixed position relative thereto for rotation therewith. The shuttle then moves rearward and ribbon slips through the one-way ribbon gripper (Frame 4). On the next forward stroke of the shuttle, the shuttle withdraws the next length of ribbon from the supply roll and, as the shuttle reaches a position above the needles, the spindle and needles rotate and introduce a twist in the ribbon between the needles and the ribbon guide (Frame 5). The shuttle then moves downward and applies a second portion of ribbon to the needles to close the first loop of the bow (Frame 6). Successive applications of space ribbon portions to the needles (repetition of Frames 4 through 6) result in formation of the desired twisted loops disposed on different radii from the center of the bow. [Benner, Vol. VII, pp. 168, 171–172, 174–176; PX 12b, 12c, 26b.]

EXHIBIT 26(b)

3M  S-73

START · WITHDRAW · APPLY

RETAIN · WITHDRAW AND ROTATE · RE-APPLY

113.   The Sun cam drop-off, the Wanchek, the Tye-Sil and the Henderson bow making machines are of the cam drop-off type and all operate in essentially the same manner, as schematically illustrated in the attached diagram.   These machines have a generally horizontally movable shuttle (including a one-way ribbon gripper and a ribbon guide.) Ribbon held by the ribbon gripper is withdrawn from a supply roll by the forward movement of the shuttle (Frame 2).   As the shuttle moves forward with the ribbon, it climbs a cam until the portion of ribbon supported in a U-shaped notch at the end of the ribbon guide is positioned above a vertical spindle on which is mounted three needles (Frame 2).   The shuttle then drops off the cam vertically downward to impale the ribbon in the U-shaped notch on the needles (Frame 3).   The needles retain the impaled ribbon for rotation therewith.

The shuttle then moves rearward and ribbon slips through the one-way ribbon gripper (Frame 4).   On the next forward stroke of the shuttle, the shuttle withdraws the next length of ribbon from the supply roll and, as the shuttle reaches a position above the needles, the spindle and needles rotate and introduce a twist in the ribbon between the needles and the ribbon guide (Frame 5). The shuttle then moves downward and applies a second portion of ribbon to the needles to close the first loop of the bow (Frame 6).   Successive applications of spaced ribbon portions to the needles, with the intermittent rotation of the spindle and needles (repetition of Frames 4 through 6), result in formation of the desired twisted loops disposed on different radii from the center of the bow.   [Benner, Vol. VII, pp. 181–183, 185–188; PX 4, Tab 13; PX 26c, 28a, 28b.]

EXHIBIT 26(c)

CAM DROP-OFF

HENDERSON, SUN (AUGSBERGER) TYE-SIL AND WANCHEK

114. The Ragen Mark II bow making machine, schematically illustrated in the attached diagram, has a horizontally reciprocating shuttle (including a one-way ribbon gripper and a ribbon guide). Ribbon held by the ribbon gripper is withdrawn from a supply roll by the forward movement of the shuttle (Frame 2). The shuttle is moved forward with the ribbon until the portion of ribbon supported in a U-shaped notch at the end of the ribbon guide is positioned above a vertical spindle on which is mounted three needles (Frame 2). A cam then raises the spindle and needles vertically to impale ribbon in the U-shaped notch on the needles (Frame 3). The needles retain the impaled ribbon for rotation therewith. The spindle then lowers and the shuttle moves rearward and ribbon slips through the one-way ribbon gripper (Frame 4). On the next forward stroke of the shuttle, the shuttle withdraws the next length of ribbon from the supply roll and, as the shuttle reaches a position above the needles, the spindle and needles rotate and introduce a twist in the ribbon between the needles and the ribbon guide (Frame 5). The spindle and needles then move upward and apply a second portion of ribbon to the needles to close the first loop of the bow (Frame 6.) Successive applications of the needles to the ribbon, with the intermittent rotation of the spindle and needles (repetition of Frames 4 through 6), result in formation of the desired twisted loops disposed on different radii from the center of the bow. [Benner, Vol. VII, pp. 191–195; PX 4, Tab 10; PX 26d, 27a, 27b.]

EXHIBIT 26(d)

RAGEN MARK II

| 1 START | 2 WITHDRAW | 3 APPLY |
| 4 RETAIN | 5 WITHDRAW AND ROTATE | 6 RE-APPLY |

115. Ribbon in the Ragen Bowmatic Models is withdrawn from a supply roll by a continuously rotating rubber-covered feed roller against which the ribbon is pressed by a steel idler roller (Frame 2). The ribbon is moved forward until the end portion of the ribbon is supported in a U-shaped notch at the end of the ribbon guide positioned above a vertical spindle on which are mounted three needles (Frame 2). A cam then raises the spindle and needles vertically to impale ribbon in the U-shaped notch on the needles (Frame 3). The needles retain the impaled ribbon for rotation therewith. The spindle then lowers as the ribbon continually is withdrawn from the supply roll. In their lower-most position, the spindle and needles rotate and introduce a twist in the ribbon between the needles and the ribbon guide. (Frame 4). Ribbon continues to be withdrawn and fed (Frame 5). After a pre-determined second ribbon portion is in the U-shaped notch, the spindle and needles are moved upward to apply the needles to the ribbon to close the first loop of the bow (Frame 6). Successive applications of the needles to the ribbon with the intermittent rotation of the spindle and needles (repetition of Frames 4 through 6), result in formation of the desired twisted loops disposed on different radii from the center of the bow. [Benner, Vol. VIII, pp. 3–10, 15–18, 19–22; Howson, Vol. X, pp. 94–97; PX 4, Tab 11; PX 16a, 16b, 16c, 26e.]

EXHIBIT 26(e)

RAGEN MARK III (MODEL 350)

| 1 | 2 | 3 |
| START | WITHDRAW | APPLY |

| 4 | 5 | 6 |
| RETAIN AND ROTATE | WITHDRAW | RE-APPLY |

116.  The Camberloc bow making machine, schematically illustrated in the attached diagram, has a horizontally reciprocating shuttle (including a one-way ribbon gripper and a ribbon guide). Ribbon held by the ribbon gripper is withdrawn from a supply roll by the forward movement of the shuttle (Frame 2).  As the shuttle reaches its forwardmost position, a portion of the ribbon supported by a U-shaped ribbon guide is impaled on three needles on a horizontal spindle (Frame 3).  The needles retain the impaled ribbon for rotation therewith.  The shuttle then moves rearward and ribbon slips through the one-way ribbon gripper (Frame 4).  On the next forward stroke of the shuttle, as the next length of ribbon is withdrawn from the supply roll, the spindle and pin rotate and introduce a twist in the ribbon between the pin and the ribbon guide (Frame 5).  Continued forward movement of the shuttle supplies a second portion of ribbon to the needles to close the first loop of the bow (Frame 6). [Benner, Vol. VIII, pp. 31–35; PX 4, Tab 16; PX 14a, 14b, 26f.]

EXHIBIT 26(f)

CAMBERLOC

1  START

2  WITHDRAW

3  APPLY

4  RETAIN

5  WITHDRAW AND ROTATE

6  RE-APPLY

117. Berwick cites the following prior art in support of its affirmative challenge of the validity of the '223 and '240 patents in suit:

*United States Patents Nos.*

| | | |
|---|---|---|
| 216,241 | 2,528,622 | 2,799,956 |
| 413,283 | 2,528,820 | 2,826,225 |
| 853,367 | 2,542,222 | 2,841,905 |
| 1,209,525 | 2,563,678 | 2,845,736 |
| 1,224,268 | 2,584,254 | 2,849,821 |
| 1,587,294 | 2,681,525 | 2,872,086 |
| 1,728,724 | 2,736,182 | 2,884,169 |
| 1,729,171 | 2,763,080 | 2,905,368 |
| 2,104,248 | 2,774,164 | 2,909,208 |
| 2,335,053 | 2,775,377 | |

[PX 19, Berwick's Answer to Interrogatory No. 1.2.].

118. During the prosecution of the '223 patent, the Patent Office considered inter alia U.S. Patents Nos. 2,312,645—Huber; 2,528,622—Teemsma; 2,542,222—Welch; 2,563,678—Gates; Reissue 23,-835—McMahon; 2,681,525—James; 2,-763,080—Welch; 2,774,164—James; 2,-841,905—Wanchek; 2,872,086—Duncan; and 2,884,169—Sperry. Among the classes of patents searched by the Patent Office examiner in reaching his determination that the subject matter of the '223 patent was patentable was classification number 223, sub-class 46. Webb U.S. Patent No. 1,209,525; Cook U.S. Patent No. 2,528,820; and Cook U.S. Patent No. 2,775,377 are in Class 223, sub-class 46, but those patents were not specifically cited by the Patent Office. Several other patents did not come to the attention of the Patent Office through category search or direct consideration for example Cotton U.S. Patent No. 1,728,724 and James U.S. Patent No. 2,736,182. [Howson, Vol. XVIII, pp. 54, 56–57; PX 1a; PX 3.]

119. In addition to patents considered during the prosecution of the '223 patent, Henderson called the Patent Office's attention to U.S. Patents Nos. 2,528,820—Cook; 2,775,377—Cook; 2,-799,956—Ciroli; and 2,905,368—Runyan. [Howson, Vol. X, pp. 44–45, 51–52, 55; PX 5a, Application No. 78,900, pp. 60–61.]

120. Sperry, U.S. Patent No. 2,884,169 which was considered by the Patent Office during prosecution of the '223 patent, includes a ribbon feed means in the form of a stripping block 24 which withdraws ribbon 28a and 28b from supply rolls and applies the ribbon to a loop retaining means in the form of a plate 67 which is rotated to direct loops of ribbon to one side and then the other in a hank type bow and to retain the loops. [Howson, Vol. XVIII, pp. 16–20; PX 3, Tab 31.]

121. The Sperry loop retaining means does not cause the ribbon to be twisted as it rotates from side to side and the loops are not disposed on different radii. [PX 3, Tab 31.]

122. Duncan, U.S. Patent No. 2,872,086 which was also considered by the Patent Office during the prosecution of the '223 patent, includes a "rotatable loop retaining means" consisting of a rotatable bar 21 having ribbon engaging arms 26 projecting therefrom on which are retained the loops of a hank type bow. However, the loop retainer does not twist the ribbon but merely winds it into a "hank." Additionally, Duncan does not include a ribbon feed that withdraws ribbon from a supply roll and applies it to the loop retainer. [Shaffer, Vol. XVI, pp. 39–42; PX 3, Tab 31; PX 8a.]

123. The Webb patent 1,209,525 discloses a machine for making bows such as are employed in finishing the joints of sweat bands in hats. In substance, it simulates the action of hands in tying a bow knot such as one ties in his shoe laces. The ribbon feed means successively applies portions of the ribbon to the retaining means. After a loop is formed the headstock carrying the retaining means is rotated 360 degrees to wrap a portion of the ribbon around the loop to form the knot portion of the bow. Thereafter, the second loop is

formed as it is drawn through the knot. The loops are not twisted. There is no successive application along a continuous length of ribbon to a *single* rotary loop retaining means to form successive loops which are in turn twisted between successive applications to form a completed bow having radiating loops. [Shaffer, Vol. XIV, pp. 71, 76; Shaffer, Vol. XVI, pp. 15–17, 28, 29–31; Howson, Vol. XVIII, pp. 12, 16; PX 3, Tab 4.]

124. The prior art Cotton Patent No. 1,728,724, discloses a device for forming rosette blanks. Loops of ribbon are held between two wires. In making the blank, after each loop is formed the two wires are twisted so that the loops are retained between twisted portions of the wires. The loops are not twisted. There is a rotatable loop retaining means. [Shaffer, Vol. XVI, pp. 31–37; PX 3, Tab 7.]

125. The Cook patents, Nos. 2,542,-222 and 2,775,377, disclose a machine for forming loops which are then formed into bows. A peg or finger on a turntable draws ribbon from a feed roll to form a loop as said table turns. Then succeeding pegs form additional loops as the turntable rotates until the desired number is reached. The ribbon is not twisted. [Shaffer, Vol. XVI, pp. 37–38; PX 3, Tabs 13 and 23; PX 5a, Application No. 78,900, pp. 60–61.]

126. The level of skill in the art of bow making machines at the time of the Kravig and Johnson invention of their '223 patented machine and method is demonstrated by the prior art cited by Berwick. These prior patents do not show a machine which (1) has a member for impaling a portion of ribbon on a loop retainer, (2) rotating a retainer in such a manner as to twist the ribbon within the loop being formed, (3) causing the ribbon to be impaled again to close the loop, and (4) repeating the above to form a plurality of loops along varying radii. [Howson, Vol. XVIII, pp. 14–16; PX 3; PX 19, Interrogatory Answer No. 1.2.]

127. Ribbon feed mechanisms operating in conjunction with rotatable loop retaining mechanisms were disclosed in the patents granted to Cotton 1,728,724; Webb 1,209,525 and Cook 2,775,377. The Webb and Cook patents disclose a ribbon feed which operates successively to supply ribbon to outstanding retaining fingers of a rotatable loop retaining means which rotates while holding the ribbon applied thereto with the result that a bow is formed. The Webb and Cook patents showing ribbon feed means and rotatable loop retaining mechanisms although inferentially involved in the Henderson interference proceedings were not cited in the proceedings with respect to the '223 patent before the Patent Office. [T Vol. XIV 7/19/74 pp. 65–76; XVI 7/23/74 pp. 16, 31–32, 37–38, Shaffer; Vol. XVIII 7/25/74 pp. 45–46, Howson; Pltf's Exh. 1(b); Pltf's Exh. 3, Tabs 4, 7, 23.]

128. The machines of the prior art patents did not make star bows similar to the ones at issue. An understanding of the bow formation in the high speed Bowmatic may be gained by examining the operation of the S–71 and S–72 hand machines, the Nimmo "hand-jigs" and the early Facile cam drop-off equipment. The Bowmatic is closer to the machine of the '223 patent than to the machines of the prior art patents. [Schaffer, Vol. XV, pp. 54–61, 153.]

129. While the twenty-nine prior art patents cited by Berwick did exhibit some of the same features as the Kravig and Johnson machine, none disclosed or taught the structure of the apparatus set forth in claims 1, 2, 5 and 17 or the method set forth in claims 14 and 15 of the '223 patent which could produce the same or a substantially similar bow to that made on the machine of the '223 patent. The Wanchek patent, 2,841,905, however, did disclose substantially similar, if not identical, bows to those of claims 1, 2, 4, and 5 of the '240 patent. None of the prior machines or methods were shown to be suitable for rapidly

forming attractive decorative star and pom-pon bows from continuous length of ordinary ribbon without substantial manual operations. [Howson, Vol. X, pp. 58–65; Shaffer, Vol. XV, pp. 47–48, 54–55, 57–61; Howson, Vol. XVIII, pp. 14–16; PX 3; PX 19, Interrogatory Answer No. 1.2.]

130. Insofar as patented inventions are concerned, the level of skill in the art of machine-made decorative bows at the time Kravig and Johnson patented their invention is reflected in the lack of progress which had been made toward devising apparatus or techniques for forming attractive bows rapidly, easily, uniformly, and with reduced manual operations. The prior art patents cited by Berwick demonstrate that numerous attempts to do so had been made. None of the prior art machines provided or taught a commercial solution to the basic problem which each of such workers had recognized and strived to overcome.

At Facile, Nimmo was well on the way to making a commercial success out of the type of bow patented by Wanchek when the Kravig and Johnson patents were obtained. [PX 3; PX 19, Interrogatory Answer No. 1.2.]

131. The hand-operated machines of the '223 patent introduced by 3M in 1958 found successful utilization in department stores and other business establishments desiring to provide attractively gift-wrapped merchandise. This success, along with the efforts of Facile and Chicago Printed String, stimulated a demand for faster, more highly automated production-type equipment and gave rise to an industry created to manufacture decorative bows in great quantities for the wholesale markets. [Johnson, Vol. VI, pp. 15–17, 23, 25–27, 102–107, 111–113, 124–125; Taylor, Vol. VI, pp. 135–138; Nimmo, Vol. VII, pp. 8–10; Doherty, Vol. XIII, pp. 24–25.]

132. Facile's entrance into the bow making industry followed a period in which prior art bow making methods and apparatus were actively investigated, modified and tried in search of a means for mechanically, rapidly and easily forming attractive bows. [Nimmo, Vol. VII, pp. 16–21, 21–26, 34–39; PX 7, Tab 6; PX 33; DX 126.]

133. The Kravig and Johnson apparatus, and especially the successor machines, have also received commercial recognition in that several licenses under the '223 and '240 patents have been sought and granted to various business concerns. [Proposed Finding No. 15, supra.]

134. American Greetings Corporation, a 3M licensee under the '223 and '240 patents, utilizes Bowmatic machines to produce star bows. [DeLaHunt, Vol. XVI, p. 154; PX 7.]

135. Subsequent innovators in the decorative bow industry have referred to the Kravig and Johnson concept, utilizing it as a base upon which to develop refined techniques and equipment. Numerous patent applications directed to improvements over the basic Kravig and Johnson invention have been filed and have issued as granted patents. [PX 4.]

136. Two of the subsequent innovators who have conceived of improvements upon the essential structure and method of the Kravig and Johnson patents, and who have received patents based upon those improved features, have acknowledged that their improvements are embraced within and use the basic Kravig and Johnson invention. Henderson did so by conceding infringement of the '223 and '240 patents and accepting their validity in the consent judgment entered August 14, 1970. Christianson, who developed the Camberloc machines, also has formally acknowledged that his machines employ the basic Kravig and Johnson invention. The Henderson and the Christianson patents cover automated machines much more like the Berwick devices than the original apparatus of the '223 patent. [DeLaHunt, Vol. XVII, pp. 40–41; PX 4, Tabs 12 and 13; PX 5c.]

137. The star bows which Berwick has made on each of the Tye-Sil, Wanchek, and Bowmatic machines are for

purposes of this suit, identical. [Uncontested Fact No. 13; PX 15(b).]

138. Either a star bow or pom-pon bow can be easily fashioned by hand by using ribbon with pre-punched holes at spaced intervals or by punching the ribbon with a needle or pin at such intervals. [T Vol. XI 7/15/74 pp. 4–27; Def's Exhs. 133, 134, Wanchek.]

139. The aforementioned bows can be fashioned over a simple post, such as a pencil, or by means of a thread. [T Vol. XI 7/16/74 pp. 40–45, Wanchek.]

140. A star bow formed by the method described in claim 5 of the '223 patent can be created by a simple hand operated device. [T Vol. VII 7/9/74 p. 140; Vol. VIII 7/10/74 pp. 47–48, 102–104; Pltf's Exhs. 3(a), (b) and (c), Benner.

141. The decorative bow producing machines themselves ". . . were all imparting the same essential motions to the ribbon to make the bow." The machines ". . . all served to bring about a mechanical function and activity that led toward the end result . . . the making of the star bow." A star bow substantially identical in appearance to those at issue can be produced by hand or by machine whether with pre-punched holes or not. [T Vol. VIII 7/10/74 pp. 99–118, Benner.]

142. Nimmo and Jacobson, having but ordinary skill in decorative bow formation were able to fashion decorative bows by use of techniques similar to those employed by Wanchek and taught by his patent. [T Vol. VII 7/9/74 pp. 30–32, Nimmo; Vol. VIII 7/10/74 pp. 47–48, 102–104, 117–118, Benner.]

143. In the prosecution of the application which ultimately led to the '240 patent, various examiners in the United States Patent Office were of the opinion that the Kravig and Johnson decorative bows were unpatentable by reason of prior art. On January 20, 1960, a finding was made by Patent Office Examiner J. S. Bailey that claims of the Kravig and Johnson patent application, identical to those ultimately found patentable in the '240 patent, "were rejected as unpatentable" over a patent issued to Bill Y. James, No. 2,806,313 on September 17, 1957 and over the Wanchek patent, 2,841,905. The reason given for the rejection follows:

"James discloses a decorative bow comprising a plurality of strips and material formed into a succession of loops radiating from a generally central point along a plurality of radii each of said loops having a first leg, a second leg, and a bight with each loop having one leg in common with the opposite leg of each loop each of said loops having therein a unidirectional twist with the bight thereof being smoothly arcuate and a central holding pin. Wanchek discloses a bow, Figs. 7–9 comprising a continuous length of strip material formed into a succession of loops radiating from a central point said loops having a first leg, a second leg and a bight portion. No invention is seen in forming the bow of James from a continuous strip as taught by Wanchek, since both bows appear to use similar loops."

[Pltf's Exh. 1(d), pp. 67–68.]

144. Gustav N. Wanchek was the inventor of and the holder of Patent No. 2,841,905 granted on July 8, 1958, pursuant to an application filed on December 30, 1955, covering the decorative ribbon bow referred to as the "star bow" and the "pom-pon" bow. [T Vol. XI 7/15/74 pp. 2–46; Pltf's Exh. 3, Tab 27, Wanchek.]

145. The Kravig & Johnson patent application was thereafter amended by 3M on July 22, 1960 by adding to claims 1 and 2 in the application that the ribbon to be employed is "free of spaced predisposed holding member receiving apertures" which simply means an absence of prepunched holes. In arguing for reconsideration of the Patent Office rejection of the Kravig & Johnson patent application, 3M advanced the theory that the "broader" patent claims of Kravig

and Johnson were patentable over the prior art for the following reasons:

"Each of the [prior art] references is concerned with ribbon strip material containing predetermined and predisposed spaced apertures in the ribbon length. Holding means must be inserted within *these* apertures in order *to form the defined bow.* Such is a cumbersome concept which prevented the defined bows from being susceptible of mass commercial use. The bows of the instant invention, particularly as now defined in claims 1 and 2, are formed by ribbon containing no such predetermined apertures; that is, they are composed of ribbon as it is withdrawn from supply rolls of ribbon available over the commercial market world wide. The concept leading to Applicants' ribbon has revolutionized the decorative bow business. For example, during the holiday seasons the distilleries, as a result of the instant invention, are able to utilize the defined decorative ribbon bows in mass quantities for decorating gift wrapped bottled goods. Such was not feasible or possible prior to Applicants' invention.

The instant claims define patentably over the prior art, and their allowance is in order."

With respect to claims 1 and 2 of the patent application, the only basis for patentable differentiation urged by 3M's patent counsel in their application for reconsideration before the Patent Officer was the absence of holes in the ribbon used by Kravig and Johnson for the fashioning of decorative bows. [Pltf's Exh. 1(d) pp. 69–71; T Vol. XI pp. 78–80, Howson].

146. The written statement of 3M's patent counsel to the Patent Office on June 19, 1960 that pre-punched ribbon was ". . . a cumbersome concept which prevented the defined bows from being susceptible of mass commercial use," was not accurate. While the pre-punched ribbon was somewhat cumbersome to use, Facile in 1958 was producing millions of star bows on 300 hand jigs using pre-punched ribbon. [PX 1(d), p. 71; T Vol. VII 7/9/74 .pp. 26, 30, 35 Nimmo.]

147. On March 13, 1961, the Patent Office rejected as unpatentable over the patent granted to Wanchek in view of the patent granted to James claims 1, 2, 3 and 19 of 3M's application for a bow patent. The Patent Office stated:

"Wanchek, Figs. 7–9, shows a decorative bow comprising a continuous length of strip material formed into a succession of loops radiating from a central point, each of said loops having a first leg, a second leg and a bight with each loop having one leg common with the opposite leg of each loop in succession therewith the legs of each loop intersection in uncreased face to back relation at said point, said loops having a unidirectional twist to accommodate said intersecting relation and being of generally conodial shape with the loop bights being smoothly arcuate, and central holding means retaining the loops together at said point. James shows a decorative bow with loops similar to Wanchek's loops with a pin to hold the center together. No invention is seen in arranging the loops of Wanchek into families if so desired such arrangement being considered a matter of design only. Using the center pin of James to hold together the bow of Wanchek rather than the end of the ribbon is considered an obvious expedient. *The elimination of the holes from the ribbon of Wanchek along with loss of their function is not considered inventive. While it may be somewhat slower to thread a fastening means in the holes shown by Wanchek than to fasten the bow by applicants' method the structure of the article is the issue here and the elimination of prepunched holes from the ribbon is not considered inventive as regards the article.*" (Emphasis added)

The Patent Office stated that the above action was *"final."* [Pltf's Exh. 1(b), pp. 72–73.]

148. 3M appealed from the final rejection of the aforesaid patent application urging:

"The claims on appeal are all directed to appellants' novel decorative ribbon bow, formed or fashioned, as defined in the claims, from a continuous length of strip material (such as decorative ribbon) which is free of apertures or other preparation rendered the strip material irrevocably suited only to the preparation of a bow of particular size, style, etc."

and that

". . . no one heretofore has provided in completed form on a commercial scale a decorative bow which has a really pleasing 'non-commercial' appearance."

The foregoing statement was incorrect in that the appearance of the bow disclosed in the '240 patent application was identical or substantially identical to Figures 6–9 of the Wanchek patent. Further, aperture free ribbon had been used in bow formation in various prior patents, as for example:

Welch No. 2,542,222

Sperry No. 2,884,169

Duncan No. 2,872,086

Webb Patent No. 1,209,525

With the possible exception of Duncan, at least the appearance of the bows in those prior patents was substantially different from both the Wanchek and Kravig and Johnson bows. [Pltf's Exh. 1(d), pp. 77–84; Pltf's Exh. 3, Tabs 4, 14, 30, 31.]

149. The argument advanced by 3M's patent counsel during the appeal proceedings in the Patent Office focused primarily upon the use of pre-punched ribbon by Wanchek bow and the use of the identical ribbon without "pre-spaced apertures" in fashioning the Kravig & Johnson bow. 3M urged in the Patent Office that neither the Wanchek nor the James structures suggest "any type of bow formed from an aperture free ribbon" and that each of the bows disclosed in such prior patents depended "vitally" upon the presence of "predetermined, prespaced apertures in the ribbon" and that "[s]uch is made the basis of their patentable novelty." ·[Pltf's Exh. 1(d), p. 83; T Vol. XI pp. 95–96, Howson.]

150. On January 10, 1962, the Patent Office "upon reconsideration and in view of [3M's] arguments as presented in their appeal brief filed December 31, 1971. . . ." which dealt primarily with the absence of "pre-punched apertures" in the ribbon employed in fashioning such bows, allowed the claims with respect to the bow patent. The examiner who was involved in the allowance of the patent application was a different examiner from those who had previously rejected the patent application. [Pltf's Exh. 1(d), p. 85; T Vol. XI 7/16/74 pp. 96–98, Howson.]

151. On April 4, 1962, the Patent Office issued a notice to 3M that the Kravig & Johnson application for the bow patent "has been examined and found allowable for issuance of Letters Patent". Had 3M paid the fees owing to the Patent Office, a patent would have automatically issued and the statutory seventeen year monopoly period with respect to patents would have commenced as of the date of the issuance of such patent. However, 3M failed to pay the fee and the patent application was voluntarily forfeited ·by 3M. Thereafter under allowable Patent Office procedures 3M thereupon filed a new application, No. 228,497, in the nature of a continuation application of the prior patent application. The continuation application ultimately resulted in the issuance of the '240 patent on November 26, 1963 which was more than 19 months after the aforesaid notice of allowance. 3M's action in permitting the initial application to be forfeited and re-filing a continuation application resulted in a long delay in the issuance of the '240 patent. [Pltf's Exh. 1(d) pp. 91, 94; Pltf's Exh.

1(e) p. 30; T Vol. XI 7/16/74 pp. 100–103, 105, 108, Howson.]

152. With respect to the aforementioned continuation application the Patent Office on July 3, 1963 determined that the claims in 3M's patent application which relate to Figure 17 (the pompon bow, which is Fig. 6 in the '240 patent) reads on Figure 3 in Wanchek and those claims were disallowed as "unpatentable". The Patent Office also found that:

"The limitation that the ribbon be free of aperture is not a patentable distinction. Apertures must of necessity be present in both instances. The particular shape of the looks is merely matter of choice and design. Furthermore, concoidal [sic] shapes are old as shown in James."

No appeal was taken by 3M from the Patent Office's decision and no change was made in the patent application. The Patent Office did allow claims 1, 3 and 5 of the application (claims 5, 3, and 2, respectively, of the '240 patent " . . . which read on the shapes shown in Figs. 1 and 15" (now Figures 1 and 4 in the '240 patent). Figures 1 and 4 in the '240 patent specifically deal with "the family type of bows" which is not the type of star bow produced by Defendant and is not the subject of claimed infringement in this action. [Pltf's Exh. 1(e) pp. 35–36; T Vol. XI 7/16/74 pp. 77, 108–112, 117–119, Howson; Vol. X 7/15/74 pp. 114–115, Howson.]

153. In the continuation application 3M added to its claims the following language: "the strip material of said layers being laterally displaced in areas immediately adjacent said holding means." The foregoing language was not contained in the original and abandoned patent application No. 855,484 (Pltf's Exh. 1(d)). The additional language describes matter "which is necessarily inherently disclosed in the two prior applications." Lateral displacement is inherent in the use of ribbon without apertures or holes. [Pltf's Exh. 1(d); Pltf's Exh. 1(e) pp. 8, 25, 30, 31; T Vol. XI 7/16/74 pp. 122–124, Howson.]

154. On July 10, 1963, 3M filed an "amendment" requesting "reconsideration" of the July 3 determination allowance of the amendment. One claim was withdrawn and a new claim, number 10 (now claim 1 of the '240 patent), was substituted for it. The so-called "amendment" urged that the claims "should be held patentable by the examiners for the same reasons as led to the allowance of claim 5, in view of his third sentence, second paragraph of the body of office action dated 7/3/63" and further that "the rejection of claim 8 [now claim 4 of the '240 patent] is not understood in view of the fact that it is dominated in terms by claims which have been allowed." The "Office action" of July 3, 1963 referred to in 3M's "amendment" states that: "The limitation that the ribbon be free of apertures is not a patentable distinction." The claims that were ultimately allowed were based upon figures depicting decorative bows which are not involved in this suit. There were no further determinations by the Patent Office in any way explaining, modifying, or reversing the action of July 3, 1963 other than the issuance on September 25, 1963 of notice of allowance of the patent application. [Pltf's Exh. 1(e) pp. 35–49; T Vol. XI 7/16/74 pp. 115–122, 125, Howson.]

155. The Wanchek patent discloses star bows formed from two separate predetermined lengths of apertured ribbon threaded onto a third length of ribbon. In the Figure 7 Wanchek star bow, the spacing between the apertures in one of the lengths of ribbon is greater than in the other such that loops of greater extent are formed in such length of ribbon. In forming the Wanchek star bows, the language of the patent describes legs forming each loop which are deformed so that one leg is twisted through an arc of 180° with respect to the other leg of the loop and the legs are then brought together and threaded by the third length of ribbon, the operation

being continued until all the apertures are threaded by the third length of ribbon. In the figure 8 Wanchek star bow, "the spacing between the apertures formed in the lengths of ribbon comprising the first section of bow 29 are substantially the same, thereby effecting loops of substantially the same size." In both Figures 7 and 8 Wanchek star bows, three separate lengths of ribbon are utilized, two of such lengths are of predetermined length having formed therein a plurality of uniformly spaced apertures disposed centrally and longitudinally of said ribbon, the third length of ribbon having a cross-sectional dimension such as to permit said ribbon readily to pass through the apertures of the first and second lengths of ribbon. In Figure 9, Wanchek discloses a third type of star bow which is formed of three separate lengths of ribbon interlaced with each other and threaded onto a further length of ribbon.

The above recital defines the method by which to construct the bow rather than a description of the bow itself. [Howson, Vol. X, pp. 59–67; Wanchek Patent No. 2,841,905 (PX 3, Tab 27), Col. 3, line 44–Col. 4, line 21.]

156. The bows described in the Wanchek patent are not formed from a continuous length of strip material, although later experience has shown that they may be, and the ribbons are not free of spaced predisposed holding member receiving apertures (holes). Additionally, the superposed layers of strip material at the central point are neither impaled by central holding means nor is the strip material of said layers laterally displaced in areas immediately adjacent said holding means. The lateral displacement phrase merely means that the ribbon material is not spread apart by the piercing of any impalement instrument but that the central holding means just passes freely through the prepunched holes. [Howson, Vol. X, pp. 63–65; Wanchek Patent, 2,841,905 (PX 3, Tab 27), Col. 3, line 44–Col. 4, line 21; Kravig et al Patent 3,112,240, claims 1, 2, 5 (PX 1c).]

157. The Wanchek Patent discloses in Figures 1 to 6, a pom-pon bow which comprises two separate sections of ribbon. In the language of the patent one section of the ribbon consists of a predetermined length of relatively flat resilient ribbon having formed therein a plurality of uniformly spaced apertures disposed centrally and longitudinally of said ribbon. This ribbon is deformed so that the apertures thereof are in substantially registered relation, and the portions of the ribbon intermediate the apertures are alternately looped in opposite directions to form a member of substantially sinusoidal configuration. Subsequent to such deformation, with the apertures in substantial registry, one end of the second section of ribbon is threaded through the registered apertures. This second section of ribbon has a cross-sectional dimension such as to permit the center section thereof to readily pass [sic] through the registered apertures. The opposite end of this second section of ribbon is provided with a stop means such as a knot, button or the like which is impassable with respect to the apertures. After the first section of ribbon has been threaded on the second section, a force is applied to move the loops toward the stop means on the second section of ribbon. Upon application of such force, the loops disposed on opposite sides of the second section of ribbon automatically turn relative to one another about said second section of ribbon. When all of the loops are in abutting relation with one another and compressed against the stop means, the second section of ribbon is knotted or otherwise provided with a stop means which is impassable with respect to the apertures. The size or diameter of the apertures is such as to permit the loops to readily turn [sic] relative to the second section of ribbon which is threaded through said apertures. [Howson, Vol. X, pp. 59–63, 68–69; Wanchek Patent

3,841,905 (PX 3, Tab 27), Col. 2, line 27–Col. 3, line 42.]

158. The Wanchek pom-pon type bow is not formed from a continuous length of strip material, the ribbon is not free of spaced predisposed holding member receiving apertures (holes), the loops do not have a unidirectional twist during the initial stages of bow formation although when the bow is completed a twisting is induced in the loops of the ribbon. Further, the loop legs are not creased adjacent the central point, the overlying layers of strip material at said central point are not impaled by central holding means, and the strip material of said layers is not laterally displaced in areas immediately adjacent said holding means. [Howson, Vol. X, pp. 59–63, 68–69; Wanchek Patent 3,841,905 (PX 3, Tab 27), Col. 2, line 27–Col. 3, line 42.]

159. The pom-pon bow is hemispherically shaped. [PX 10(a) and 14B.]

160. In 1955 Wanchek first made a star bow for his employer, the Chicago Printed String Co. Shortly thereafter Chicago Printed String marketed the star bows for a time. In or about 1960, Chicago Printed String Company had mass produced for it and sold star bows in which ribbon material was free of holes. The automated equipment for the production of star bows, including such equipment utilized in about 1960 to make bows for Wanchek's employer, Chicago Printed String, and such equipment designed and manufactured by Gustav Wanchek in about 1970, did not utilize pre-punched ribbon. [Wanchek, Vol. XI, pp. 13, 36–38, 40–43; DX 135, 136.]

161. Gustav Wanchek, a person skilled in the decorative bow art and whose primary assignment was to invent and create new products did not devise or use at any time prior to about 1970, when he designed and sold automated star bow equipment use, ribbon material free of pre-punched holes. [Wanchek, Vol. XI, pp. 30, 32–36, 42–43, 45; PX 3, Tab 27.]

162. The Wanchek Thread-A-Bow Kit, as originally marketed by Chicago Printed String Company, utilized an attenuated piece of pliable material, i. e., string, onto which ribbon material with pre-punched holes was threaded in accordance with Wanchek Patent No. 2,841,905. [Wanchek, Vol. XI, pp. 11, 36–37, 45; PX 3, Tab 27; DX 135, 136.]

163. Each of the star and pom-pon bows which Berwick had made and sold comprises a continuous length of ribbon formed into a succession of loops radiating from a generally central point along at least three radii, one end of the ribbon being adjacent the top of the bow, and the other end being adjacent the bottom surface. [Uncontested Fact No. 15; DeMoor, Vol. VII, pp. 117, 122; Howson, Vol. X, p. 110.]

164. In each of the star and pom-pon bows which Berwick has made and sold, loops were formed in immediate succession along the length of ribbon, each successive side of a loop overlying the previous side at a central point of intersection, and forming therebetween a smoothly arcuate bight with a unidirectional twist so that the same surface of the ribbon was exposed outwardly in each successive loop. [Uncontested Fact No. 16; DeMoor, Vol. VII, pp. 120–122, 126–128; Howson, Vol. X, pp. 108–113; PX 15b; PX 14b.]

165. The loops of each of the star and pom-pon bows which Berwick has made and sold are retained together in the form of a finished bow by a staple which, after the formation of all the loops, is driven through and penetrates the intersecting layers of ribbon at a central point from which the loops radiate. [DeMoor, Vol. VII, pp. 118, 128; Howson, Vol. X, pp. 111, 112; PX 15v; PX 14b.]

166. The ribbon utilized by Berwick in each of the star and pom-pon bows made and sold by it was not modified prior to loop formation by pre-punching holes in the ribbon. [DeMoor, Vol. VII, p. 117; Howson, Vol. X, pp. 111, 112; PX 14b; PX 15b.]

167. In the pom-pon bows made and sold by Berwick, each successive side of the loop was creased near its point of intersection with the previous side, and the loop bights formed therebetween were smoothly arcuate and of generally uniform curvature across the width thereof. [Howson, Vol. X, pp. 111–113; Shaffer, Vol. XV, pp. 88–89; PX 14b.]

168. In the accused star and pom-pon bows of Berwick, both the retractable needles which initially hold the bow together, and the staple which replaces the needles in the bow for sale in commerce, pierce the layers of ribbon without any substantial excision of ribbon material. The ribbon material is thus pushed aside or bunched slightly to accommodate first the needles, and thereafter the prongs of the staple. The ribbon is thus laterally displaced adjacent the holding means. [Howson, Vol. X, pp. 111–112, 122, 124; Benner, Vol. VII, pp. 175–176; PX 14b; PX 15b.]

169. All star bows produced by Berwick are formed from "a continuous length of strip material formed into a succession of loops radiating from a generally central point along at least three radii, said length terminating with its ends adjacent opposite surfaces of the bow defined by said loops, said loops each having a first leg, a second leg overlying the first leg at said central point and a bight with each loop having one leg common with the opposite leg of each loop in immediate succession therewith, each of said loops having therein a unidirectional twist with the bight thereof being smoothly arcuate, the same surface of said strip material being exposed outwardly in each loop, the superposed layers of said strip material at said central point being impaled by central holding means which penetrates said layers and retains said loops together at said central point, the strip material of said layers being laterally displaced in areas immediately adjacent said holding means." The star bows produced by Berwick are substantially like the bows produced by 3M on

its "S" series machines and described in its '240 patent. [Howson, Vol. X, pp. 110–112, 122, 124; PX 15b; PX 1c, claim 1.]

170. All pom-pon bows produced by Berwick are formed from "a continuous length of strip material formed into a succession of loops radiating from a generally central point along at least three radii, said length being free of spaced predisposed holding member receiving apertures and terminating with its end adjacent opposite surfaces of the bow defined by said loops, said loops each having a first leg, a second leg overlying the first leg at said central point and a bight with each loop having one leg common with the opposite leg of each loop in immediate succession therewith, said loops having therein a unidirectional twist with loop legs being creased adjacent said central point and with the loop bights being smoothly arcuate and of generally uniform curvature across the width thereof, the same surface of said strip material being exposed outwardly in each loop, the overlying layers of said strip material at said central point being impaled by central holding means which penetrates said layers and retains said loops together at said central point, the strip material of said layers being laterally displaced in areas immediately adjacent said holding means."

The pom-pon bows produced by Berwick are substantially like the bows produced by 3M on its "S" series machines and described in its '240 patent. [Howson, Vol. X, pp. 110–114, 122, 124; PX 14(b); PX 1c, claim 4.]

171. Although the star and pom-pon bows produced by Berwick are substantially similar to the bows described in 3M's '240 patent, the bows of the 3M patent are likewise substantially similar to the bows of the prior Wanchek patent. The major differences between the Wanchek and the 3M bows are: the technique used to create the bows; the absence of pre-punched holes in the bow of the 3M patent; and the Wanchek

use of a string or an attenuated piece of pliable material to hold the bow together rather than something rigid as in the 3M patent.

Wanchek initially used a post in the formation of his bows and then substituted a string in order to make it easier for consumers. The James patent showed an ordinary brass paper clip similar to a Cotter pin as the central holding means in that bow. The star bow made by Wanchek on the post fell into place on the post and achieved the desired star bow configuration by the bow-maker merely imparting a slight twist to the central holding means while the pre-punched ribbon was being threaded over the top of the post. [Transcript, Vol. VII, 7/9/74, pp. 28–34, Nimmo; Vol. XI, 7/16/74, pp. 11, 22, 42, 45, Wanchek; Vol. VI, 7/8/74, pp. 54–55, Johnson; Vol. VIII, 7/8/74, pp. 99–118, Benner; Plaintiff's Exhibit 3, Tabs 19, 20, 27; Plaintiff's Exhibits 1 (c), 1(d), 1(e); Defendant's Exhibits 122, 133, 134.]

172. Berwick has acquired a total of eleven Tye-Sils, two Wancheks, twenty-two Ragen Bowmatics and one Camberloc from 1966 through 1973, and Berwick's investment in such equipment is approximately $265,000. [Prior Court Finding No. 17; Doherty, Vol. II, pp. 13, 19, 21–28; Doherty, Vol. XIII, pp. 106–128; PX 19; DX 59–92; Prior Court Finding No. 17; Answer to Plaintiff's Interrogatory No. 18 filed October 11. 1973; Affidavit of Frederick B. Doherty in support of motion for partial summary judgment filed October 18, 1973; Doherty, Vol. II, pp. 13, 19, 21–28; Doherty, Vol. XIII, pp. 106–128; PX 19; DX 59–92, inc.]

173. Berwick's bow business has grown greatly in recent years. In 1961, it sold about 2,000,000 bows which amounted to about 8% of its business. In 1966, its sales were about 11,000,000 to 12,000,000 bows which amounted to from 25% to 30% of its business. Since 1966–1967 when Berwick began selling extensively to the big variety chains, its bow business has expanded to 30% to 40% of its business and for several years it has been selling over 100,000,000 bows per year. At the present time, Berwick's sales of bows account for from 38% to 40% of its business. The bow business is still expanding and Berwick's president seeks even more rapid production star bow making machines. [Doherty, Vol. II, pp. 9–13, 28–34; Doherty, Vol. XIII, pp. 29–31, 108.]

174. Berwick manufactures and sells ribbon and bows. It also purchases ribbon and converts it into packaged items. The fact that Berwick has equipment to make bows has been a factor in Berwick's entry into the big variety chain store market in the United States, and has generated sales of ribbon by Berwick. [Doherty, Vol. XIII, pp. 23–23A, 47, 53.]

175. Although Berwick's gross sales on bows are approximately $1,250,000 per year, Berwick's profits on bows alone (without taking into account profits on derivative sales of ribbon, etc.) would not warrant the expenditure of $30,000 per year as a license fee. [Doherty, Vol. II, pp. 28–29, 33–34; Doherty, Vol. XIII, pp. 29, 31, 54, 108.]

176. When Berwick originally entered the bow making business through the purchase of an Augsburger machine in November, 1960, bow production was a small segment of its business. Defendant's interest in and ability to enlarge its bow making activities was fostered by 3M's representatives who offered to accept orders on behalf of Berwick for bows made from 3M's "Sasheen" ribbon. The 3M representatives also offered Berwick the opportunity of getting in "on ground floor" with respect to production of bows on automated equipment if Berwick became one of 3M's ribbon "converters." [T Vol. XIII 7/18/74 pp. 25–26, Doherty; Finding No. 30 Minnesota Mining & Manufacturing Co. v. Berwick Industries, Inc., 373 F.Supp. at p. 853.]

177. Because of the seasonable nature of the decorative gift wrapping

business, with the bulk of the sales occurring at the Christmas season, large warehousing facilities were required and constructed by Berwick to store its bow production. Throughout the 1960's and until June 25, 1971 no representative of 3M ever advised Berwick that its bow making business would subject it to a claim of patent infringement. Berwick relied on the absence of any claim by 3M in proceeding with the enlargement of defendant's bow making business. As Berwick's President put it, his company "would never have bought * * * and invested $300,000 in machinery if [he] thought that [he] was going to subsequently get into a lawsuit" with 3M. [T Vol. XIII 7/18/74 pp. 40–41, 46, 104, Doherty. See Findings 16, 17, 27, 28, 29, 35–38, Minnesota Mining & Manufacturing Co. v. Berwick, supra, pp. 855–858.]

178. In 1966 there was a decided change in the marketing of decorative bows through the introduction by the mass retail merchandisers of plastic bags each containing a number of bows. The Ragen Bowmatic machines were developed and marketed at or about that time providing the necessary high production equipment to ·enable Berwick and others to enter the mass marketing field. The star bows achieved very substantial commercial success by reason of the introduction of the plastic bags into the market place. [T Vol. VII 7/9/74 p. 100, Nimmo; Findings 16 and 17; Minnesota Mining & Manufacturing Co. v. Berwick Industries, Inc., supra, p. 855.]

179. 3M was aware of Berwick's alleged infringing activity in early 1961. On October 15, 1965, Berwick wrote Frederick Christianson, a 3M licensee, of its desire to purchase additional automatic bow making equipment from Christianson. The communication was referred to 3M's patent counsel, Stanley G. DeLaHunt, who on October 25, 1965 forwarded to Paul A. Bard, an executive of 3M, a form of letter to be sent by Christianson to Berwick advising Berwick:

"Enclosed please find a brochure describing our Camberloc Automatic Bow Machine. However, since the machine and its use to produce decorative bows, are covered under U.S. Patents owned by the 3M company, a licensee from 3M (which is readily available from them) is necessary. If you will contact Mr. A. H. Redpath, 3M Company, Saint Paul, Minnesota, 55101, details in respect to the licensee will be promptly supplied. When you secure the licensee, we will sell you the equipment directly."

Berwick never received the letter. Mr. Bard was not called to testify at this trial as to the foregoing. Although in 1965 3M and its patent counsel were aware of Berwick's bow making activities and need for additional bow making machinery, Berwick was not advised of Plaintiff's asserted patent rights. [Minnesota Mining & Manufacturing Co. v. Berwick Industries, Inc., 373 F. Supp. 851, 863; T Vol. XVII 7/24/74 pp. 41–49; Pltf's Ans. to Def.'s 1st Inter. p. 19; Pltf's Exh. 37; Pltf's Exhs. 38A, 38B, 38C; T Vol. XVII 7/24/74 pp. 11–13; T Vol. IV 1/10/74 pp. 126, 127; T Vol. XVII 7/24/74 p. 13.]

180. 3M has not been able to produce a satisfactory completely automatic decorative bow making machine and in the mid-1960's discontinued the production, sale and leasing of its automatic equipment, the S–73, and limited itself to the production of the collar button type decorative bow production machine. [Minnesota Mining & Manufacturing Co. v. Berwick, supra, Findings 8, 9, p. 855; Def's Exh. 55; T Vol. II 1/8/74 pp. 19–21, 72, Doherty.]

181. 3M has entered into six royalty producing license agreements covering one or both of the patents here in suit. In 1965 and 1966, three license agreements were made, each providing for a royalty of two-tenths of one cent ($0.002) for each bow produced and used or sold. In 1970, in settling a patent infringement, a license for three months only was granted at varying rates of

eight one-hundredths of one cent ($0.-0008) or two-tenths of one cent ($0.002) per bow or six percent (6%) of the selling price. Also, in 1970, a license was granted under Patent 2,933,223 to make and use, but not sell, bows in the packaging of the licensee's commercial products on payment of a royalty of eight one-hundredths of one cent ($0.0008) per bow. In 1971, 3M granted a license to Sun, regardless of the extent of the licensee's sales, past and future, for one hundred eighty thousand dollars ($180,000), payable over a six-year period. In 1971 three licensees agreed to pay a royalty of two-tenths of a cent ($0.002) per bow. Royalties paid to 3M under these license agreements through November 1, 1973 totaled $403,158.42. Of this, $60,000 was attributable to the 1971 lump-sum license, and most of the remainder was from licenses bearing the royalty rate of two-tenths of one cent ($0.002) per bow. [DeLaHunt, Vol. XVII, pp. 133–135; PX 7.]

182. The license agreement entered into between 3M and Sun in the face of imminent litigation on April 20, 1971 provided for the payment of total royalty of $180,000 "as full consideration for the right and license granted" to use "equipment and any method comprehended" within the '223 patent and to sell "any decorative bow comprehended within any claim" of the '240 patent, and further said $180,000 royalty was in "full compromise and settlement for all claims of Licensor for all past manufacture, use and sale by Licensee of Licensed Bow Making Equipment and Licensed Bows." Facile had been engaged in bow production since the early 1960s and assuming that 3M was entitled to assert patent rights against Sun for its bow production since its entry into the bow market, the release of claims for past manufacture, use and sale involved a release for six years prior to April 20, 1971. [Pltf's Exh. 7, License Agreement dated April 20, 1971 between 3M and Sun Chemical Corp.]

183. In several instances where smaller manufacturers desired a license under the patents in suit annual royalties based upon actual sales, without any obligation to pay minimum royalties for subsequent years even though sales should decline or to pay any future royalties should sales cease, were agreed upon. In these cases, the manufacturers were required to disclose and report their annual sales to 3M in order to calculate such royalties and a royalty rate of $0.002 per bow was established. [PX 7, Tabs 1, 3 and 5.]

184. At $0.002 per bow sold, one licensee has paid annual royalties to 3M as follows:

| Year | Bows | Royalty |
|---|---|---|
| 1967 | 16,652,395 | $ 33,304.79 |
| 1968 | 15,697,455 | 31,394.91 |
| 1969 | 10,272,970 | 20,545.94 |
| 1970 | 15,717,700 | 31,435.40 |
| 1971 | 18,596,300 | 37,192.60 |
| 1972 | 23,076,510 | 46,153.02 |
| 1973 | 24,933,385 | 49,866.77 |
| 1974 (Jan.–March) | 6,170,335 | 12,340.67 |
| | 131,117,050 | $262,235.10 |

Sales of this licensee have grown by over 50% since 1970 despite the $0.002 per bow royalty burden. This licensee sells its bows through retail stores. Unlike Berwick's bows which are small and packaged many to a bag, this licensee's bows are sometimes sold for 35 cents apiece at retail. [DeLaHunt, Vol. XVI, pp. 145–146.]

185. In the case where the established royalty is a lump sum $180,000 payable in equal installments over six years without regard to whether sales increased, decreased, or ceased altogether, $90,000 had been received by 3M from the licensee to the date of the July hearing. [DeLaHunt, Vol. XVI, pp. 141, 147, 151; PX 7, Tab 6.]

186. Sine 1965, 3M has licensed Patefor Co., American Greetings Corporation, Hallmark Cards, Inc., Hiram Walker & Sons, Inc., Aranac Ribbon Mills, Inc. and David J. Henderson, and Sun Chemical Corporation under the pat-

ents in suit, and has, to November 1, 1973, received $403,158.42 in royalties from all such licensees. [PX 7.]

187. On December 29, 1971, 3M's patent counsel wrote to Berwick's counsel apprising it of 3M's willingness to license the patents under one of two possible rates, the lump sum proposal being $180,000. Subsequently, 3M offered a third alternative to Berwick which would have provided for a running royalty rate of 5% of the net selling price not to exceed a maximum of $0.002 per bow sold. [PX 21a.]

188. After Berwick was notified by 3M in June, 1971 that 3M was asserting patent rights with respect to the bow making machines and the decorative bows Berwick attempted to negotiate a license arrangement with 3M. [T Vol. XIII 7/18/74 pp. 133, 137–138, Doherty; Vol. XVII 7/24/74 pp. 90–94, De-LaHunt.]

189. Based upon Berwick's production figures the royalty of $2. per thousand would cost defendant more than $200,000 per year. The royalty based upon gross sales price would exceed $50,000 a year. The flat royalty of $180,000 was the lowest of the royalty fees offered Berwick by 3M. Berwick's president, Frank Doherty, met with 3M's executive Redpath at 3M's Minnesota offices in February, 1972 to see whether he could arrive at a more economical arrangement for his company. [T Vol. XVII 7/24/74 pp. 121–24, De-LaHunt; Vol. XIII 7/18/74 pp. 135–136, Doherty.]

190. In March, 1973 after the institution of this action, Berwick's President, travelled to 3M's offices and met with ·a Mr. Moffitt, Mr. Redpath's successor as head of the Retail Gift Wrap and Tape Division, to attempt to negotiate a license fee in an amount less than $180,000. Mr. Moffitt advised Mr. Doherty that now the royalty would be $180,000 plus $45,000, "retroactive back to the time of 1971, plus interest on that money for that time." During this litigation, 3M asked the Court to fix a royalty of over $200,000 per annum. [T Vol. XIII 7/18/74 pp. 55–59, Doherty; Vol. XVII 7/24/74 pp. 94–96, DeLaHunt; Vol. XVIII 7/25/74 pp. 149–154, Mr. Haight's Closing.]

191. Berwick advised 3M that Sun's bow production was two or three times that of Berwick's and thus to exact an identical flat royalty from both companies would place defendant in unfair competitive position. Berwick undertook to negotiate payment of a royalty of an amount which it thought to be in reasonable proportion to the $180,000 charged to Sun. 3M refused to give consideration to the relative capacity and volume of production of Berwick vis-a-vis Sun. [T Vol. XVII 7/24/74 pp. 101, 123, 124; DeLaHunt; Vol. XIII 7/18/74 pp. 73, 79–81, Doherty; Minnesota Mining & Manufacturing Co. v. Berwick, supra, order of this Court dated April 1, 1974, as modified on May 15, 1974.]

192. The star bow production capacity of Sun Chemical is substantially greater than Berwick's production capacity. Sun's capacity appears to be from two to three times defendant's capacity. Sun entered into an exceptionally advantageous transaction with 3M because of its large production rate. [T Vol. XIII 7/18/74 pp. 79–82, Doherty; Vol. VII 7/9/74, sealed Court Exh., p. 76, Nimmo.]

193. The institution of this infringement action and 3M's claim for "triple damages" and "an injunction" against Berwick immediately came to the attention of Berwick's creditors and its factor. The nature of Berwick's business requires it to borrow substantial sums of money on short term loans to accommodate the seasonal flow of its business. [T Vol. XIII 7/18/74 pp. 60–63, Doherty.]

194. The pendency of this infringement action also came to the attention of Berwick's customers and prospective customers. In 1973 Berwick was negotiating a $200,000 order for decorative ribbon and bows from G. McNew, a mass merchandiser. Berwick was advised by the buyer that it was to be

awarded the order. However, in 1973 Berwick was called to an executive meeting by the buyer and its vice-president in charge of sales to discuss the pendency of this law suit and perhaps because of the prospective buyer's concern as to whether Berwick would be able to undertake delivery of the merchandise by reason of this suit and the demand for injunctive relief the order was not given to Berwick. (T Vol. XIII 7/18/74 pp. 63, 139, 140, Doherty.]

195. Berwick incurred $101,000 in counsel and expert witness fees with respect to the first phase of the trial in this case which related only to the issue of laches and estoppel. William E. Wright Co. contributed $30,000 towards the litigation expense. In addition, Berwick will have further expenses for legal fees, experts' charges and disbursements in connection with the trial of the second part of this action which related to the validity and infringement of the patents. [T Vol. XIII pp. 69–77, Doherty.]

196. 3M does not manufacture industrial equipment for the production of decorative bows, it is in the business of selling ribbon and accordingly desires and intends that its licensees use as much 3M ribbon as possible. 3M adopted a licensing policy under the '223 and '240 patents that was geared to obtaining royalties on the production of the decorative bows as opposed to obtaining royalties upon the manufacture and sale of bow producing machines. [T Vol. V 1/11/74 pp. 30–36, DeLaHunt; Minnesota Minning & Manufacturing Co., supra, Finding 60, p. 862.]

197. During a visit by Messrs. Redpath and DeLaHunt to the Ragen plant there were at least a dozen Bowmatic machines visible in the assembly area in various stages of production. Ragen manufactured and sold approximately 100 Bowmatic machines, the bulk of which were sold after the occasion of the visit to the Ragen plant by 3M's representatives. Approximately 8 or 9 companies purchased Bowmatic machines. [T Vol. XII 7/17/74 pp. 110–111, Lopata.]

198. 3M was and is a major supplier of ribbon to paper distributors. Commencing in 1966 Berwick began to obtain business in that industry. Within a short period Berwick acquired a substantial dollar sales volume from paper distributors and thus made inroads into 3M's market. [T Vol. XIII 7/18/74 pp. 47, 65, Doherty.]

199. Berwick's production of bows in 1973 was as follows:

| Name of Machine | # of bows | |
| --- | --- | --- |
| Bowmatic | 87,000,000 | 83.45324 |
| Tye-Sil Wanchek | 16,000,000 | 15.34772 |
| Camberloc | 1,250,000 | 1.19904 |
| | 104,250,000 bows | 100.00000% |

The Court reaches the following conclusions of law:

1. Plaintiff's patent No. 2,933,223 is valid.

2. Plaintiff's patent No. 3,112,240 is invalid.

3. Defendant's Tye-Sil, Wanchek, and Camberloc machines infringe the 2,933,223 patent. The Tye-Sil and Wanchek machines also infringe claims 14 and 15 of the 2,933,223 patent.

4. Defendant's Ragen Bowmatic machines do not infringe Plaintiff's 2,933,223 patent.

5. 3M is not estopped from asserting its rights under the 2,933,223 patent against Defendant.

6. Plaintiff's policy with respect to the enforcement of the patent rights under the 2,933,223 and 3,112,240 patents does not constitute an equitable misuse of the patents.

7. Plaintiff's policy with respect to the enforcement of the patent rights under the 2,933,223 and 3,112,240 patents does not constitute a violation of the anti-trust laws.

8. Plaintiff is entitled to a reasonable royalty from Defendant with respect to Defendant's use of the Tye-Sil, Wanchek, and Camberloc machines.